## STINE vs. WILKSON AND OTHERS.

10    75
117   32

1. Chancery has jurisdiction to control the acts of a trustee, under a deed to secure the payment of money; and where the powers conferred on the trustees are not strictly pursued, will set aside his sales.

2. A more strict compliance is required where the *cestui que trust* has meddled with the duties of the trustee, and become the purchaser of the property, at a greatly reduced price.

3. Although no one act of the *cestui que trust* may of itself be sufficient, yet if all his acts taken together shew a fraud upon the debtor, the deed will be set aside.

4. Where the deed of trust required twenty days previous notice of the time and place of sale, it is not sufficient to have it published but once. The obvious intent is to have the publication continued up to the sale.

*Stine* vs. *Willkson and others.*

5. Where a notice was published once in the "Evening Gazette," and then transferred to the "Atlas," it was held insufficent, although the "Atlas" was the weekly reprint of the "Evening Gazette," a daily paper—it appearing that the "Atlas" was published for, and circulated in the country, while the "Gazette" was almost entirely confined in its circulation to the city.

## APPEAL from St. Louis Circuit Court, (in Chancery.)

GAMBLE & BATES, *for Appellants, insist:*

1st. That the decree in this case must rest upon the establishment, by the evidence, of the facts charged in the bill as the ground of relief.   Story on Equity Pleadings 24; 7th Wheaton 523.

2d. That the advertisement of the sale, (which is the only part of the proceeding in relation to which the bill makes charges, and upon which evidence was given,) is only to be impeached for the causes alledged in the bill, and these are: 1st. That it was published in a paper of limited circulation.   2d. That it was published but four times.   3d. That it did not state that there was a shot tower on the property to be sold.   4th. That there was no hand bills set up.

On the first, no evidence of comparative circulation was given.   On the second, the publication was sufficient according to the terms of the deed of trust.   13th Ohio Rep.

The third and fourth objections are merely gratuitous additions to the duties of the trustee not warranted by the deed which prescribes his duties, nor by any law that regulates his discharge of such duties.

3d. The inadequacy of the consideration is not charged in the bill, and if it had been, it would form no ground of relief in a public sale, openly and regularly conducted, by the agent of both parties, and where there is no fraud charged or even attempted to be proved in the conduct of the sale.

It is stated in the bill that one Williams, at a sale of the property, bid $2600, and then refused to take it.   And it is also stated that Wilkson, at the same sale of the property of his bankrupt debtor, bid $2600 for it, but it is not alledged any where what was the value of the property.

But if the complainants had charged inadequacy of price, this is not a case in which such charge would be of any weight.

GEYER, *for Appellees, relies on the following grounds:*

1st. The trustee was bound to execute the trust in all its parts in his own person, and was not authorized to commit any part of his duties to Stine, the creditor, or permit him to control the advertisements, or the management of the sale.

2d. Though a compliance with the letter of the deed of trust, may be sufficient to transfer the estate to a *bona fide* purchaser, standing in no fiduciary relation to the subject, yet in order to support a sale in equity, where the creditor is the purchaser, it must appear that every thing was done, usual in such cases, in order to effect a sale at a fair price.

3d. A single publication in a newspaper, twenty days before the day appointed for the sale, is not a compliance with the terms of the trust, and a publication of the same notice in some other paper, as in this case, within the twenty days, will not aid.

4th. The publication, first in the Gazette, and afterwards in the Atlas, is deceptive; and Stine having undertaken to discharge a material part of the duties of trustee, and afterwards becoming

the purchaser, is bound to prove not only that no fraud was intended by him, but that no injury resulted from his acts.

5th. The deed of trust, so called, is in equity a mortgage with trust for sale, and the debtor and his representatives were entitled to redeem at any time before a sale, effected in good faith, should be completed—and in this case, at any time before a deed executed to Stine, he being only entitled to his debt and interest.

6th. The defendant Stine, after having acted in place of a trustee, could not become the purchaser, so as to preclude the right of redemption, as against McKinder and his creditors.

7th. In a mortgage or trust for sale, the trustee is not only bound to execute the trust in all its parts in person, but is bound to regard in all cases the rights and interest of the debtor, as well as the creditor, and cannot confide the discharge of any part of his duties to either, without a departure from his trust.

8th. It was most material to the right of the debtor and to his creditors, that the notice of sale should be such as to effect an advantageous sale. The creditor having, in this case, taken upon himself that part of the duty of the trustee, and becoming afterwards the purchaser, was bound to prove very clearly that every thing was done that could be done for the interest of the other party; or at least that no injury could, or did result to the debtor; having done neither he cannot be allowed to retain the advantage unduly obtained by his interference.

9th. The debtor in this case having reposed his confidence in the trustee, and not in his creditor, it was a violation of his rights to transfer the duties, or any of them, of that trustee to the creditor.

10th. If an advertisement once published twenty days or more before the sale, is a compliance with the letter of the deed, the property was not so described as to show what was to be sold— the trustee or his substitute ought to have mentioned every part calculated to attract purchasers, to the same extent that a prudent man would in a notice to sell his own property. If the trustee did not, his substitute did know of the existence of the shot tower on the lot, which gave it its chief value, and his subsequent purchase, under such circumstances, is a suspicious circumstance, which, unexplained, is evidence of a fraudulent design. The proclamation at the sale is no substitute for an advertisement, however often repeated by the auctioneer.

11th. The fact that Stine assumed the duties of the trustee, without the knowledge or consent of the debtor, that he requested a notice of sale to be written, which should allow barely time sufficient, and with a description according to the deed, when he knew and concealed from the trustee the fact of the erection of the shot tower, a fact not only material as affecting the value, but important in the description—that he selected a paper, in which to publish it, having no circulation in the country—that it was published in that paper only once, and then transferred to a paper in which advertisements are not usually inserted—that in fact, general notice was not given —that the property was of great value—known to Stine, and not made known to the public by the means agreed upon—that it was bid in by Stine, at one-sixtieth of its value, are circumstances which, unexplained, show that the whole proceeding was delusive, and the contriver ought not to be allowed to profit by it. Green vs. Winter, 1 J. C. R. 27; Holdridge vs. Gillespie, 2 J. C. R. 30; Davone vs. Fanning, ib. 252; Howell vs. Baker, 4 J. C. Rep. 118; 1 Powell on Mortgages 9-13; 3 do. 1043-1065; Denning, et al. vs. Smith, et al. 3 J. C. R. 332.

McBRIDE, J., *delivered the opinion of the Court.*

This was a bill in Chancery, brought in the Circuit Court of St. Louis county, by the complainants against the defendants and others. In the bill it is alleged that a certain Edward McKinder, being indebted to the

defendant, on the 6th September, 1839, executed his note to him for $800, payable six months after date, with interest, at the rate of ten per cent. per annum, subject to two renewals of six months each; and in order to secure the payment of the said note, executed a deed, conveying to Josiah Spalding, in trust for the purpose aforesaid, a lot of ground adjoining the northeast corner of the town of Carondelet, in said county; it being the same lot of ground which was leased to McKinder, for the term of twenty-five years, from and after the 20th November, 1839, in consideration of the annual rent of thirty dollars, subject to renewal at double that rent by Anthony Wilkson and James C. Evans, and on which was erected a valuable shot tower, ready for operation.

That on the 20th January, 1840, Edward McKinder assigned to Wm. Robinson and James O'Hara, all of his property of every kind whatsoever, in trust, for the benefit of his creditors, amongst whom are the present complainants. That the property so assigned, embraced among other, the lot of ground on which was erected the shot tower, adjoining the town of Carondelett, and which had previously been deeded, in trust, to Josiah Spalding.

That on the 8th February, 1840, Robinson and O'Hara, as trustees, advertised the lot in question for sale, and on the 29th of the same month the lot of ground was publicly offered for sale, before the court house door in the city of St. Louis, and a certain Edward L. K. Williams, being the highest bidder, it was struck off to him, at the sum of $2600, subject to incumbrances thereon, amounting to between twelve and fifteen hundred dollars. A short time previous to the sale, Robinson, one of the trustees, left the country, and has not since returned—that Williams, the purchaser, refused to accept the individual bond of O'Hara, the remaining trustee, for a title, and also refused to pay the amount which he bid for the said property.

That prior to the falling due of the note executed by McKinder to Stine, O'Hara the trustee, McKinder and Wilkson were anxious, and each of them offered to renew the same for six months after its maturity, according to the provisions of the deed of trust, but Stine refused to assent to the same. When the note became due, Spalding, the trustee, advertised the lot of ground aforesaid for sale, in the "Evening Gazette," a paper published in St. Louis, and on the 1st April, 1840, at the court house door, in said city, exposed the same to sale, when Jacob R. Stine, the defendant, and *cestui que trust*, being the highest bidder, it was struck off to him at the sum of $106 00. That Wilkson, one of the complainants, was a creditor of McKinder at the time, to the amount of $3000,

and resided in Washington county, about eighty miles from St. Louis, did not see the advertisement of the sale made by Spalding, nor hear any thing about it until he came within a mile or two of St. Louis, on the day the sale took place, when he heard to his great astonishment that the property had been sold and sacrificed.

That as soon as he reached the city he went to see Stine, and offered to pay him the full amount of McKinder's note, with interest and costs, which he declined to receive, and this offer was made by him as a creditor of McKinder, in about three quarters of an hour after the sale was made, and before a deed had been made by Spalding, the trustee, to Stine. Immediately after the proposition of full payment was made to and refused by Stine, Wilkson called upon Spalding, and offered to pay to him as trustee the full amount of McKinder's note, with the interest which had accrued thereon, but that Spalding also refused to accept the same.

That the "Evening Gazette," as was well known to Stine, had a very limited circulation beyond the limits of the city of St. Louis—that the advertisement of Spalding was published only four times, and merely gave the boundaries of the lot of ground in question, with a few other particulars, but did not state the fact that a valuable shot tower had been erected upon the said lot of ground, which constituted its chief value, but the same was omitted intentionally in order to mislead the community, and defraud those interested. That no pains were taken to give publicity to the sale, by advertisements circulated, or stuck up in any of the public places in the county of St. Louis, stating the time and place of sale, and giving a full and true description of the lot of ground about being sold, and the shot tower thereon.

That the shot tower erected on the lot of ground in question, cost between six and seven thousand dollars for its erection; and that the said complainant Wilkson, at the sale made by O'Hara, bid for the said lot of ground, subject to all the incumbrances on the same, the sum of $2600.

That Stine took possession of the lot, and the shot tower thereon, on the day of sale, and has put the shot tower into operation, and is now in possession of the same, enjoying the profits thereof. Jacob R. Stine, Josiah Spalding, Edward L. K. Williams, William Robinson, and James C. Evans, are made defendants. The bill concludes with a prayer, that the deed from Spalding to Stine, be vacated and annulled and given up —that Stine be compelled to surrender possession to O'Hara, assignee of McKinder, and pay damages, or reasonable rent, from the 1st April, 1840, for the premises—that all right or title acquired by Williams, at

the sale made by Robinson and O'Hara, be extinguished and forfeited—that the powers vested in Robinson be revoked, and that O'Hara be fully invested with the power of selling and conveying the premises, under the provisions of the deed of McKinder, made 21st of January, 1840, and for general relief.

On the coming in of Josiah Spalding's answer, the bill was dismissed as to him. An order of publication was made as to Robinson, and a decree *nisi* against him, and on the hearing, the bill was dismissed as to Evans—Williams did not answer.

The answer of the defendant, Jacob R. Stine, states that McKinder failed to renew his note when it became due; and called on him before the property in the deed of trust was advertised by Spalding, the trustee, and informed him that he could not renew the note, and to go on and make the sale. Denies that McKinder, O'Hara, or Wilkson, offered to renew the note of the former, or that the latter offered to give his own note in lieu with good security. That after a failure of payment or renewal of the note, the defendant called on the trustee Spalding, to take the necessary steps for a legal sale of the property in the deed of trust, and that said Spalding wrote a notice of the sale, describing the property as the same is described in the deed of trust, and gave it to him to be published as required in the deed of trust.

That the defendant caused the said notice of sale to be advertised in the "Evening Gazette," a newspaper published in the city of St. Louis, and having, as he understands, a large circulation, particularly in the city of St. Louis, and its immediate vicinity, where nearly all of the complainants reside. Denies that there was any purpose on his part, or that of the trustee, to conceal any fact in relation to said property, which could render it more saleable in the market; and denies that there was any purpose to prevent the general knowledge of the sale, by selecting the "Evening Gazette" for the publication of the notice of sale. He did not expect to conceal the notice of said sale, when he caused the advertisement to be published four times weekly, in a newspaper which circulated all over St. Louis, and when the deed of trust required no more than one insertion of the advertisement.

That William J. Austin, the auctioneer, was employed to make the sale, and in doing so he did proclaim that there was on the premises a shot tower, which had cost several thousand dollars. The sale was made at the same time when the said auctioneer was selling other property, and when there was a large collection of people attending such sales, and in front of the court house door. That the respondent became the purcha-

ser of the property at said sale for the sum of $106, and has received a deed from Spalding, the trustee. After the sale had been made, and on the same day, Wilkson, one of the complainants, offered to pay the amount of McKinder's note, if the defendant would release the property, which he declined to do, believing that he was under no legal or moral obligation to do it. Since his purchase, proceedings have been instituted to enforce divers liens of mechanics, and he will have to pay divers sums of money to clear the said property from incumbrances.

That before the note of McKinder fell due, the respondent offered to said Wilkson, to receive security therefor, and for another incumbrance which he had on the premises, and release said premises from all of his claims, but that Wilkson would not accede to his proposition. He denies fraud, &c.

To the answer of the defendant Jacob R. Stine, the complainant, filed a replication.

On the 24th January, 1843, the cause came on for hearing in the Circuit Court, upon the bill, answer, replication, exhibits and proofs, when the Court decreed that the sale made by Spalding, the trustee, be set aside, and that the deed which he executed to the defendant Stine, be cancelled and annulled. The Court found that Stine had taken possession of the premises in controversy, on the day of sale, and still retains the possession, wherefore he ought to account for the reasonable rent thereof, and appointed a commissioner to take an account of the same, as also an account of debt, interest, and costs of the note of McKinder, and such other disbursements as were legally made by the said Stine, and report. After the report of the commissioner, the Court entered a decree in conformity thereto, and the foregoing principles, from which the defendant appealed, and has brought the cause here.

The evidence preserved by the bill of exceptions, shows that the several deeds referred to in the bill and answer were read in evidence.

Josiah Spalding, a witness on the part of the complainants, testified that he acted as trustee for Mr. Stine in the suit. About the time of the sale, before the notice was given, Mr. Stine called on me at my office, stating that McKinder could not renew the note, and that therefore he must proceed under the deed of trust, and requested me to advertise and have the sale made according to the deed. I drew an advertisement for the sale, which I think described the property in the deed of trust, and gave him the advertisement and directed him to have it inserted in some of the city papers for the requisite time—don't recollect the time. I don't think I knew what paper it was in until Mr. Stine brought me the

paper containing the advertisement, in order that the sale might be made. At the day, hour, and place of sale mentioned in the advertisement, I procured Mr. Austin to sell the property, and he proclaimed that there was a shot tower on the premises—it was struck off to Stine at a small sum—don't recollect the amount.

Sometime afterwards, on the same day, a gentleman called on me, said his name was Wilkson, and said he wished to pay the amount due to Stine, mentioned in the deed of trust, so that the sale would not be carried into effect. I told him that I was a mere trustee, and referred him to Stine, remarking to him, from his statements to me, that I should be much gratified if Mr. Stine would take the money and let the matter end. He then said he had already seen Stine, and that he refused to settle the matter in that way. I told him then if Stine insisted on it, I must give him the deed. Stine afterwards called for the deed, and I executed it to him. I don't remember the hour of sale, but have no doubt I was there at the hour. When Stine came to me to draw the deed, I think there was a conversation in relation to the matter, the tenor of which I do not recollect, but I do not recollect whether he said that Wilkson offered him the money—Wilkson came in and told me that he had the money ready to pay me, but the necessity of paying it was done away with by my refusing to receive it. I do not know who accompanied Wilkson, or whether any one did—I recollect that Mr. Risque called, and stated Mr. Wilkson's claims.

It was after the sale, upon the same day, and before the deed was made, that Mr. Wilkson called on me—I cannot tell whether the deed was made upon the same day, or the day after—Mr. Stine called very soon after the sale to have a deed made out. I knew he took means to take possession directly after the sale, perhaps the same day or the next day, as he was apprehensive they would get possession and give him trouble. I do not know whether I advised Mr. Stine about receiving the money or not. I think that the certificate of the printer was brought to me, stating that the notice had been published the requisite number of times. I do not recollect whether at the time I drew the notice, I knew that there was a shot tower on the land described in the notice—but, upon reflection, I think I did know that a man by the name of Evans had been engaged in building a shot tower there. I do not know that I made myself acquainted with the particulars, as to how much of the shot tower was built, or how much it increased the value of the land. I do not recollect whether John D. McMurry called on me before the sale, and asked me to postpone

the sale as long as possible, that Wilkson might be here in time for the sale.

Cross examined :—Robinson & McMurry was a firm in this city; John D. McMurry, the partner, resided here; I suppose the firm had been doing business here; Holman & Axtell was a firm doing business in the city also; I do not know John C. Atkison; do not know E. L. K. Williams; I think it was the "Evening Gazette," in which the notice was published; the style of the paper was the "Western Atlas and Saturday Evening Gazette;" the publication in that paper did not surprise me; it did not strike me as being defective on account of the number of the circulation of that paper; I have been concerned in a great number of trust deeds, and I do not recollect that I ever made out a description in a notice different from that in the deed; I have generally handed them to the party or his agent, if in the city, and gave myself no further concern in the matter until the sale; the place where an advertisement is most likely to be read, when published in a newspaper, is where it immediately succeeds the editorial matter; I do not remember whether Mr. Stine requested me to allow some days more than necessary in order to enable the holder to renew the notes; defendant's exhibit B., No. 2, is the deed that I executed to Stine; I cannot say that I executed it the day it bears date, or on the day it was acknowledged; it was dated the 1st of April.

I do not recollect whether there was any other property sold at the court house on that day, or whether Austin, the auctioneer, was then engaged in sales; I do not recollect any movement or action on the part of Mr. Stine, calculated to deter any person from bidding; I did not observe any difference in the sale from what takes place usually upon sales under deeds of trust; I did not see any action of Mr. Stine, in preparing the sale, or at the sale, which led me to suppose that he wished to obtain an undue advantage; after the sale I thought he was rigorous in enforcing the sale, and not taking the money, insisting upon his legal rights; I myself should have taken the money, not on account of any legal right existing on the part of Wilkson, but as a matter of liberality; I should do so in every similar case if it were my own affair.

Re-examined :—I never took the Evening Gazette, or Western Atlas; and do not know that the Evening Gazette circulated in the city, and the Western Atlas in the country; I think the notice was published weekly for the time; I have, in sales in the city, advised that the notice should be published daily, and that, in order to make it bring as much as possible, that hand-bills should be struck off, but I have not advised it to be done in sales of country property; it is customary in sales of city pro-

perty to have hand-bills struck off, I think, but not of sales of property in the country; I do not know, at that time, I saw either of the papers, or that I ever saw the Western Atlas; I did not take either of the papers; I do not know that it was transferred from the Gazette to the Atlas; I gave no directions about the publications that I recollect of; Mr. Stine might have come to me and obtained directions about the paper, the mode of publication, and all particulars, but at this time I cannot recollect it; as trustee I acted for the interest of all concerned.

William Bayliss, testified:—On one occasion I rode down with Mr. Byrne, who had some intention of purchasing the shot tower, to look at it; I presume it was about the 1st April, 1840; I have no recollection as to the precise month; as well as I recollect we were told by some person at the time we were at the tower, or afterwards, that it had been sold, and that Stine had bought it; then the matter ended so far as he was concerned; it was Mr. Byrne's intention, as he told me, to purchase it, if he could obtain it at a reasonable price; I have no recollection as to what conclusion we came to as to its value; I have understood that Mr. Byrne has means to invest in property of that description; I have no recollection of having seen the notice of the sale by Mr. Spalding, though I might have seen it; the matter made but very little impression on my mind; I went into the shot tower; it looked to be well built, though I do not consider myself a judge of such things; I do not think it was entirely completed, though I may be mistaken; I think shot had been made there, though I cannot be positive; I was told by the individual there that there was something to be done to complete it; the whole matter made so little impression on my mind that I cannot be positive; we did not know that the property was not for sale, or we should not have gone; I think that the person in charge there told us that Mr. Stine had purchased it.

Jerry S. Allen, testified:—I was one of the proprietors of the Gazette and Atlas, at and previous to April, 1840; the notice of the sale of Mr. Spalding was handed into the office, and ordered to be inserted four weeks; it was first published in the Evening Gazette one insertion, and then transferred from the Gazette to the Atlas; it was published in the Atlas of the 14th March, 21st March, and 28th March, 1840; it was published first on the 11th March, 1840, in the Evening Gazette; I think the notice of sale was published at the request of Mr. Stine; I never had any communication with Mr. Stine; I had the charge of the printing department, and received directions to transfer the notice from Mr. Holbrook, my partner; it was inserted in the Gazette of the 11th March, and after the first insertion I received directions from Mr. Holbrook, to

transfer it to the Atlas; the Gazette and Atlas are different papers, one is calculated for city circulation, and the other for the country; one is daily, and the other weekly; the advertisement of the country paper is transferred, as a matter of course, from the daily paper to the weekly; the Gazette was intended as a commercial paper; the matter of the Atlas was chiefly made up from the matter of the Gazette; there were articles in the Atlas which were not published in the Gazette; the circulation of the Atlas was very limited in the city; its circulation was principally in the country, amounting to about four hundred; on one or two occasions there were orders given to transfer similar notices from the city to the country paper, though it was not the usual practice ; as near as I can recollect the Atlas did not circulate in Washington county, though I could not tell unless I refer to the subscription book ; the Gazette was not sent to Washington county.

Cross examined:—The advertisement in the Gazette is in the most conspicuous part of the paper, being the place for the new advertisements; the weekly paper is composed of matter contained in the daily; the same type which was set up and used for the Gazette, was placed in the form of the Atlas, though the Atlas contained one page, (the third,) which was set up for the Atlas, and did not appear in the Gazette, except sometimes when it was transferred from the Atlas to the Gazette, when there was room for it; the title of the weekly paper, is the "Western Atlas and Saturday Evening Gazette;" if a notice was handed to me, without any direction, which was to be published weekly, I should place it in the Gazette; the Gazette was understood to be the paper for advertisements; the advertisements were transferred from the Gazette to the Atlas as we had room for them.

Re-examined:—The circulation of the Gazette was from 900 to 1000, principally in the city.

Thomas Byrne, testified:—I had some idea of purchasing the shot tower in the spring of 1840, and went down to look at it, but whether it was before or after I learned it was for sale, I cannot say; I saw nothing of the advertisement of Mr. Spalding, but heard some time before the sale that the property was for sale, or would be sold, but at what time I was not informed; I had not made any specific intimation of the value of the property; I had made enquiries as to what the property was worth, situated as it was near St. Louis; I did not make up my mind what it was worth, as I learned it was sold; I did, however, say to some gentlemen that if it was clear from incumbrances of every kind, it might be worth from $2500 to $2700.

Cross examined:—When I spoke of the property as being worth from 25 to $2700, it was with the understanding that it was free and clear from all incumbrances.

James B. Bowlin, testified:—I brought three suits for the bank against Wilkson, on notes, one of which was made by Wilkson, and the two others by McKinder; after I had obtained judgments in the suits I sent executions to Washington county, and an arrangement was made by Mr. Wilkson with the bank, to pay in instalments at four months; I received one instalment $500, less the sheriff's commission $492; I have seen many signatures which McKinder acknowledged to be his, and think that the notes in the suits, which witness holds in his hands, are his.

There was a large amount of rock to be excavated in building the tower, much labor must have been expended in its erection; I should think it must have cost $4000, but it is very much a matter of guess with me, as I am not acquainted with such work; Mr. Stine has been for the last two years working in the shot tower; does not know what the rent of it, per annum, is worth.

Cross examined:—At the same time I brought the suit against Wilkson, I brought suit against McKinder, and before I could obtain judgment against him he became insolvent.

Hiram Paddleford, testified:—I understood the shot tower was to be sold on the 1st April, 1840; I understood it from various persons, and I think Mr. Stine told me so; I was not present at the sale; I presume it was the sale by Mr. Spalding, as trustee; I had conversations with Mr. Stine about the shot tower, in the event of his purchasing it; that there might be arrangements made that we should manufacture shot together; he said he thought he should be the purchaser; he said that it was advertised in an obscure part of the paper, and he thought it would not be noticed; he said nothing about the prospect of there being other bidders for the property; I do not recollect that Mr. Stine said any thing about giving directions to have the notice published in an obscure part of the paper; he told me after the sale that he was the purchaser for a small amount, something over $100; the amount I do not know exactly.

On the day of the sale, and after the sale, Mr. Stine directed me to take possession of the property; that he thought if he took possession there would be no difficulty in holding it; I rode down immediately after he conversed with me, and took possession of the tower; Mr. Evans came to the tower soon after I took possession; perhaps half an hour or less Mr. Wilkson and some others came there; Mr. Wilkson seemed to be angry, and thought there were some wrong proceedings about it; Mr.

Wilkson took formal possession of the tower, as he said, in the names of the persons present, who were McMurry, McKinder, and some others that were there; soon after Mr. Wilkson came there some difficulty arose between him and James C. Evans; the cause of the difficulty was some words that originated from the other parties, which words I do not recollect; I do not know whether I ever saw any money offered by Mr. Wilkson to Stine, nor do I recollect that Stine ever told me that Wilkson offered him the money in payment of the notes; Mr. Stine told me that Wilkson offered to pay him $800, and that he told Wilkson if he would pay him all of his claims against the tower he might have it; Mr. Evans brought me written directions from Mr. Stine to take possession of the tower; independent of the written directions, Mr. Stine requested me to take and keep possession, if I could do so.

I have been concerned in the management of the tower after Mr. Stine purchased it; at that time it might have been rented for $1000 per annum; I would have been willing to have given that sum for it; I have not actual knowledge of the cost of the tower, but suppose it might have cost from $5000 to $7000; it was not entirely completed, but nearly so; it might have cost from $200 to $500 to complete it.

Mr. Stine told me that the advertisement was in an obscure part of the paper, and probably there would be no one to bid upon it except himself; this conversation might have been a week before the sale; cannot say whether, at the time he mentioned about the advertisement, he asked me to help carry on the business; it was before the sale that he spoke to me about assisting him in conducting the business.

Cross examined:—The value of the yearly rent is different now from what it was two or three years ago; I would not now be willing to give more than $300 per annum; I do not know that I would give that sum; in speaking of the cost of the tower I am guided by what I have heard from others; I have no actual knowledge of the cost; I do not know who was in possession of the tower, but perhaps Mr. Evans was; I found no other than Mr. Evans in possession when I went down there; Mr. Wilkson, and the others who came with him to the shot tower, avowed their intention to be, in coming, to take possession of the tower; Mr. Wilkson spoke of the sale having taken place that afternoon; I knew McKinder; I do not know, only from report, that he was insolvent; I knew nothing about his circumstances.

John Bent, testified:—I cannot say that I recollect any conversation between Mr. Stine and Mr. Wilkson on the day of the sale. Mr. Stine then had his office in the same building with me. A few minutes after

the sale was over, Mr. Wilkson came into my office. Mr. Stine afterwards asked me about the legality of the advertisement—he told me that there had been a long notice, that he had waited for Mr. Wilkson, and felt it necessary for him to bid at the sale. He also told me that Mr. Wilkson wanted to pay up, and discharge the debt, and have the deed made to him, but Stine said he did not know that there was any obligation upon him to do so. They held a conversation in my presence, but what it was I am unable to detail.

Cross examined.—Mr. McKinder was at that time bankrupt, and I believe had taken the benefit of the insolvent laws—he told me that he had made an assignment.

Thomas B. Targee, testified:—I was auctioneer to Conn, Sprigg & Green, and sold under a deed of trust, by request of Capt. O'Hara, on 29th February, 1840. The property was knocked down to old Mr. Williams, at what price I do not recollect, but think it was in the neighborhood of $2600 or $2700. I cannot recollect whether there was any thing said about incumbrances on the property. There were other bidders at the sale besides Mr. Williams—I had nothing further to do with it after the sale.

Cross examined.—The Williams who purchased was Mr. E. L. K. Williams—I know nothing about Mr. Williams's ability, but it produced some little surprise in my mind to find him the purchaser. I do not know whether Mr. Williams was a by-bidder or not—Capt. O'Hara, I think, was at the sale.

Peter Tiernan, testified:—I was present at the sale of this property by McKinder's assignee, Capt. O'Hara; the time of the sale was about the 29th February, 1840—it was knocked off to Mr. E. L. K. Williams at $2700, the last bid before Mr. Williams was by Wilkson and John Perry, for $2600. I heard Mr. Wilkson bid, and Mr. Perry afterwards told me that he and Wilkson were to be in partnership. There was at the time of the sale nothing said about incumbrances by the auctioneer, but some person then said there was an incumbrance of $800 on the property. Mr. Williams and Mr. Wilkson both told me that they knew of the incumbrance, and at the same time said it had some time to run, and could be renewed at 8 per cent. on the amount.

I was not astonished at Mr. Williams bidding—after the purchase was made Mr. Williams asked $150 as a *bonus* for his bargain—Wilkson offered him the use of that sum for 6 or 12 months at 6 per cent. as a *bonus*, but Williams declined taking it without he could have his own time for payment. Mr. Edward McKinder built the shot-tower. Hav-

ing seen the bills of the carpenter, and been there frequently while it was going on, I think it could not have cost less than $5000,—amounts were shown me up to about $6000. Mr. McKinder admitted to me that Mr. Wilkson had furnished the greater part of the funds for building the tower. Mr. Wilkson is a miner of lead in Washington county.

I was present at the sale made by Mr. Spalding—it was about 12 o'clock, M.,—there were not a great number of persons present. I saw Mr. Wilkson in 10 or 15 minutes after the sale—I had not left the front of the Court House when he came up—he started off to find Mr. Spalding—did not see him that day in company with Mr. Stine. I cannot say whether Stine ever told me that he and Wilkson had an interview on that day. I think there were three bids on that day—it was struck off at $106. I am under the impression that Mr. Stine started it at $100—some other person bid $5, and Mr. Stine then bid one dollar more.

Cross examined.—At the second sale Mr. McKinder and McMurry were present. Mr. O'Hara was also there, I think, but am not positive; being a sale under a deed of trust, of a single piece of land, there were not so many present as at a sale of several pieces of land. Mr. McKinder was indebted to me, but I had not come into the assignment, but told McKinder when he was able he might pay me, and I thought if this property brought a fair price I might perhaps get my money—that was the only interest that induced me to attend the sale at all.

John H. Baldwin, testified:—It was along in the middle of the day which I heard was the day of sale, that I saw Mr. Wilkson. Mr. Stine was then collector, and had his office near me. I did not see Stine and Wilkson in conversation on that day.

Elijah Hayden, testified:—I know the signature of both Robinson & McMurry—the note shown me dated 13th January, 1840, is the signature of Robinson. Witness is also shown a note of Edward McKinder, dated 16th Sept., 1839, for $900, endorsed "Robinson & McMurry," "Anthony Wilkson." This is also the signature of Robinson.

The complainants then gave in evidence the promissory notes about which Bowlin, Baldwin and Hayden testified, showing that Edward McKinder was indebted to the complainant, Anthony Wilkson.

D. L. Holbrook, a witness for the defendant testified:—I was before, and on the 1st April, 1840, one of the proprietors of the Evening Gazette—the advertisement of Mr. Spalding as trustee is published in the most conspicuous part of the Evening Gazette, of the 11th March, 1840. I do not recollect that I received any directions in regard to the advertisement—I know of no reason why the advertisement was transferred,

except in case of sales of property lying in the country; the advertisement was usually published in the country paper, which was made up of matter published in the daily paper, and had the title of the "Western Atlas and Saturday Evening Gazette." The transfer was such a one as would have been made by me without any directions, though it was Mr. Allen's business to arrange the matter of the paper. The paper I call the country paper, was a weekly paper—I consider them as much one paper as the daily and weekly Republican, and generally there was no other matter in the weekly but what had been in the daily. The transfer would not have been made from the fact that the advertisement was to be published weekly, as many advertisements of that kind were published in the daily. The Sheriff's advertisements of sales are put in the daily, and he pays the common advertisement price. I do not recollect having received any directions in relation to this advertisement at all.

Cross examined.—I have no recollection of having given any direction to Mr. Allen as to the transfer—it was Mr. Allen's business to make up the forms—the placing the advertisements rested with Mr. Allen, unless some directions were given, and then I gave the same directions to him. I have no recollection of having given any directions to Mr. Allen to transfer an advertisement without having myself received some directions about it. In advertisements of sales under deeds of trust and Sheriff sales, I did not usually look over them, but handed them to the compositors. After that, there was nothing more to be done before looking over the proof—I did not generally read the proof about that time—in our office the proof is usually taken from the galley; after the proof is read, it is the duty of Mr. Allen to correct it, and make up the form. I did not generally interfere in making up the form unless it is to dispose of some matter by special request. Before the proof is read, we do not generally know whether the property advertised is in the country or town. I have no recollection about the particular advertisement. I do not know that I ever transferred a Sheriff's advertisement of this county from the Gazette to the Atlas—the Sheriff sometimes advertises property in the country—I have no recollection of any other case when, without special direction, I transferred an advertisement of this kind from the Gazette to the Atlas; it might have been that for a short time, a few months, one page of the Atlas was made up of matter not previously published in the Gazette, but generally it was wholly made up of matter before published in the Gazette. I do not know what the reason for inserting an advertisement in the weekly paper rather than in the daily unless when the property is in the country—the coun-

try paper circulates in the country—and the daily paper does not go out of the city—the country paper does not circulate much in the city—from 80 to 100 copies circulate in the city. As a general rule, if an advertisement was handed in, it would go in the city paper, and not in the country paper;—if an advertisement was handed in without any direction, I should not, of my own accord, insert it in the city paper, and then transfer it to the country paper. The circulation of the city paper was at that time about 800—it ran from 700 to 1000—the circulation of the country paper was about 350.

The reason of the difference in name of the two papers was, that one was intended for city and the other for country circulation. I believe that there is a difference of title between the daily and weekly Republican. The Atlas was not a paper intended for advertisements—without directions, I should not have inserted an advertisement in the Atlas.

William J. Austin, testified:—I am a regular auctioneer of the city, and been engaged in that business 23 years. I acted as auctioneer in the sale made by Mr. Spalding, as trustee of McKinder, of the property on which the shot tower stands, on the 1st April, 1840. The attendance was as large as usual on such occasions—a pretty large crowd—there was a sale of another piece of property there on that day, and the attendance was larger than usual in sales of that description. At the commencement of the sale, I read the advertisement of the sale, and made mention that there was a shot tower on the premises, and that the property was valuable—worth several thousand dollars. Capt. O'Hara was present at the sale. McKinder and McMurry were also present. I do not recollect that either of the firm of Holman & Axtell was there. I dwelt on the sale as long as usual. I wished to obtain as much as possible, and as long as there was a possibility of obtaining a bid, I dwelt. I used as much exertion as is common to recommend the property to the by-standers. Mr. Stine spoke to me to make the sale—there was no request on his part for me to do anything at the sale to give him the advantage. I had seen the advertisement of the sale before I was applied to, to make the sale. Mr. Stine did nothing at that sale to discourage bidding that I recollect of;—the sale was made as sales of that description are usually made, by reading the advertisement and announcing the sum to be raised. McKinder spoke something about the matter, but what, I do not recollect; perhaps he spoke of there being liens on the property. There were other bids besides that of Mr. Stine's. Witness produces a memorandum book, in which is sale of property by order of Mr. McKinder. I think from that memorandum that Mr.

McKinder must have spoken to me about making the sale. Knowing that McKinder, O'Hara and McMurry were interested in the matter, I appealed to them to bid.

Cross examined.—From the memorandum made, I think that McKinder ordered the sale—perhaps it may be a mistake, or by the order of the trustee of McKinder. I must have seen the advertisement in the Gazette. I do not think that I was directed by Mr. Stine to announce the value of the property, but did so of my own accord. I commenced the sale between 12 and 1 o'clock. I think I saw Mr. Wilkson in the afternoon of that day, but am not certain. I cried the property 15 or 20 minutes, I suppose. I think there was something mentioned at the sale about incumbrances other than the deed of trust, but whether I mentioned it I cannot tell. I cannot tell whether Mr. Stine conversed with any of the by-standers while the sale was going on. I have been frequently engaged as auctioneer at sales under deeds of trust;—it is usual to sell property with valuable improvements on it without handbills;—property improved by a shot tower, is out of the usual character of improvements in advertisements of sales under deeds of trust; very little is usually said about the improvements—sometimes saying with the improvements thereon, and sometimes describing the improvements.

Joseph Leblond, testified :—I live in Carondelet, and was, at the time of the sale by Spalding as trustee, and still am, Post Master at Carondelet.

The Western Atlas and Saturday Evening Gazette came to my office, and still comes there—I could not say that I saw the advertisement of the sale by Mr. Spalding, but I heard of it. I do not take the paper myself, but Mr. Hoffman, who keeps a hotel in Carondelet, does. I cannot tell whether I heard of the advertisement of the sale before it took place or not;—at the day of the sale I talked with Mr. Stine, and he told me I had better go and buy the shot tower, but I told him there were too many difficulties about it, or that I did not want to get into difficulty.

Cross examined.—At the time of the sale there came two copies of the Atlas at the office, both, I believe, to the same person, Mr. Hoffman. One was the Evening Gazette and the other the Atlas.

James C. Evans, testified :—I heard, before the sale by Mr. Spalding as trustee, a conversation between McKinder and Stine, when McKinder told Stine that he could not pay the debt, and that Stine must proceed and sell the factory. This conversation was about one month before the sale by Spalding as trustee.

In the investigation of this case we have been led to the examination of the principles governing mortgages, inasmuch as deeds of trust are assimilated so nearly thereto. A mortgage is a conveyance of an estate by a debtor to his creditor as a security for the payment of money, with a proviso that the conveyance shall be void on such payment. If payment be not made according to the terms of the deed, the creditor may file his petition against the mortgagor and those in possession of the mortgaged premises, praying that judgment may be rendered for his debt, and that the equity of redemption may be foreclosed, and the mortgaged property sold to satisfy the amount of said debt. A deed of trust is a conveyance of an estate by a debtor to a third person as a security for the payment of money to another, with a proviso that in the event of non-payment as stipulated in the deed, the trustee shall make sale of the estate and apply the proceeds to the payment of said debt.

It will then be seen that the only material difference between a mortgage and a deed of trust, consists in the intervention of a trustee, vested with the power to sell. The trustee is regarded as agent for both debtor and creditor, and should stand indifferent between them, as it may not unfrequently happen that questions of importance will arise in the discharge of his duties which will demand his impartial action. Although the law is so, yet we cannot close our eyes to the fact, that most generally the trustee is selected by the creditor, because of his known subserviency to him, and instead of looking to the interest of the debtor, he is alone prompted to action from the impulse given by the creditor. The creditor, therefore, having the virtual power of appointing the trustee, and infusing action into him, it is not unreasonable to hold the creditor and his agent to a strict accountability for the manner in which the trust is discharged. If the question were now presented for the first time in this Court, we should be strongly inclined to adopt the language of Judge Tucker, in his notes, and say "it may well be doubted, indeed, whether upon principle such a contrivance could elude the operation of the broad principle of equity, that every contract for the securing of money by the conveyance of real estate to the lender, not made in contemplation of an eventual arrangement of property, is is equity deemed a mortgage."

Deeds of trust having become so common in the practice of this country, and having received the sanction of our Courts, it now only remains to adopt such principles for their government as will most effectually secure the rights and interests of the parties to them. This prerogative, Courts of Chancery have claimed and exercised wherever deeds of

trust have been tolerated. They have interfered and restrained the trustee from proceeding to sell in cases where the debtor claimed to have paid the debt intended to be secured, or a part of it, as also where there was a supposed defect in the title of the property conveyed by the deed until an investigation could be had and the title freed from doubt or embarrassment. The trustee has, by the Courts, been compared to a commissioner of a Court of Chancery, for a sale of lands under its decree, having no greater powers, and having no other than those given by the decree. His sales are put upon the same footing of judicial sales. If the powers conferred on the trustee are not strictly pursued, the sale will be set aside by a Court of Chancery : this, however, we are informed, should not be done on frivolous grounds, where a stranger has become the purchaser. But very different is the rule where the *cestui que trust* has officiously intermeddled in the duties of the trustee, and become the purchaser at a sum greatly below the value of the property, or where he has by his conduct prevented other persons from bidding, whereby the property is sacrificed and bought in by himself.

We are not prepared, however, to go the entire length contended for by the complainant's attorney, and hold that at any time before the execution of the deed by the trustee, the debtor or those interested as creditors may come in and pay the debt, interest and costs, and abrogate the sale, where there has been no unfair conduct on the part of the *cestui que trust*, however inadequate the price at which the property sold. Although in so deciding no greivous wrong would be done the *cestui que trust*, as the object which he had in view in taking the deed would be attained. Policy alone forbids the adoption of such a principle.

In adverting to the testimony in the cause, our minds are irresistibly led to the enquiry, how has it happened that property worth from $4000 to $5000 was sold at public auction for the inconsiderable sum of $106? Property which a few months before in the same market sold at public auction by a trustee, with an admitted and known incumbrance of 12 or $1500 thereon, for the sum of $2600; and there is no evidence that it was less valuable at the second than at the first sale. Although no one of the various circumstances attending the transaction is sufficient of itself to force absolute conviction that there was unfairness, yet taken all together, and coupled with the ruinous sacrifice of the property, and we are satisfied that the transaction was not fair.

Mr. Stine appears to have known that there would be little or no competition in the biddings, and that he should most probably acquire the

property at a greatly reduced price ; for prior to the sale he informed Mr. Paddleford that he expected to become the purchaser, and for what reason ? because he said the advertisement of the sale by the trustee was inserted in an obscure part of the paper. Whether this was said in reference to publication in the Gazette or Atlas is not stated—it was not true of the notice published in the Gazette, but may have been true of the other publication.

The insertion of the advertisement of sale by the trustee once in the Evening Gazette, and then its transfer to the Atlas, is another circumstance calculated to excite suspicion. Mr. Allen says that he received orders from his partner, Holbrook, to make the transfer, and although the latter cannot recollect of having received any such direction from Mr. Stine, yet he says positively that he never gave orders to make transfers without direction to that effect from those having a right to control the matter. After the sale, and on the same day, and after an interview with Mr. Wilkson, it appears that Mr. Stine's mind is still laboring on the subject of the notice, for Mr. Bent says that Mr. Stine enquired of him about the legality of the advertisement—that Stine told him that there had been a *long notice*—that he had waited for Mr. Wilkson, and felt it necessary for him to bid at the sale—that Wilkson wanted to pay up and discharge the debt, and have the deed made to him, but Stine said that he did not know that there was any obligation upon him to do so.

Stine appears to have been the first to raise any question as to the sufficiency of the notice, or of the manner of its publication, and builds his hopes, first to acquire the property at the sale, because there would be few bidders, in consequence of the manner of the publication of the notice, and, secondly, to hold the property under his purchase, thus superinduced because there had been a *long notice*. But still, possession is a strong point in the law, and it may be well to bring this to the support of his title, and hence he parlies with Mr. Wilkson under the pretext that he wants a short time to reflect upon the proposition which the latter has made, to pay the debt and accruing interest until he can send an agent to take possession of the property, which is done. If Mr. Stine was not distrustful of the regularity and legality of the proceedings under the deed of trust, why such haste to get possession of the premises ?

Was the notice given in this case, by the trustee, of the intended sale of the property, to satisfy the debt intended to be secured by the deed of trust, sufficient ? In default of payment as stipulated in the deed,

the trustee was to "proceed to sell said land and premises at public auction for cash to the highest bidder, at the Court House door in St. Louis, first having given twenty days previous notice of the time and place and terms of sale, and property to be sold, by advertisement in some newspaper printed in the city of St. Louis."

It appears from the evidence of Messrs. Allen and Holbrook, that the first publication was made on the 11th March, and in the Evening Gazette, and then transferred to, and published in the Atlas on the 14th, 21st and 28th March. The sale took place on the 1st April then following. If the publication in the Evening Gazette be excluded from the computation of time, then the notice was not published *twenty days previous* to the day of sale and continued as is directed by the deed of trust. But it was contended by the counsel for Stine that one publication of the notice would satisfy the requisition in the deed, and that one having been made in due time, in the Gazette, the after notice published in the Atlas might be rejected. The deed of trust does not specify particularly the number of times when the notice shall be published, but enough can be collected from that instrument which, when taken in connection with the acts of Stine the defendant, show what must have been the intention of the parties. The language used in the deed on this subject is substantially the same as that used in our statute directing how a Sheriff shall give notice of a sale of real estate under execution. Would one publication of a notice by a Sheriff of an intended sale of real estate under execution, made in a newspaper twenty days before the day of sale, be held to be a compliance with the requisition of the statute, which directs him to give twenty days previous notice of the time, &c., by advertisement in some newspaper printed in the county, &c? We apprehend that such is not the general understanding, nor the practice in the country—but that such notices are *continued to be published* until the day of sale.

The first publication of notice was made as before stated on the 11th March, in the Gazette. Why was it afterwards continued in the Atlas, if Mr. Stine believed the one insertion to be sufficient? The continuation of the publication up to the day of sale, shows that Stine, at least, who controlled that matter, thought it then necessary. Let us see what would most probably be the consequences of tolerating one publication in the Gazette as a compliance with the requirement in the deed of trust. Twenty days prior to the day of sale, a notice appears in the Evening Gazette, stating that certain property therein described will be sold at a time and place therein named, for the purpose of satisfying a debt due

to Stine from McKinder, &c. This notice is seen and read by the readers of the Gazette, on the week of its publication,—the next week on examination of the Gazette, it is ascertained that the notice has been withdrawn. This withdrawal would authorize the conclusion that some adjustment of the matter had taken place between the parties, and that no sale would be made of the property. If this be so, then the manner of giving the notice, and its transfer, were deceptive and well calculated to mislead the public mind, and prejudice the rights of McKinder and his creditors, and, in this point of view, was highly objectionable. If one publication of the notice, made at least twenty days prior to the day fixed for the sale was sufficient, what would forbid the giving of that notice thirty, sixty, or ninety days before the day of sale: and yet such a notice would be unquestionably bad.

The length of time when the notice was to be given, prior to the day of sale being fixed by the parties, shows that the intermediate time was intended to be occupied by such notice :—was this done by the subsequent insertion and continuance of the notice in the Atlas? It is said that the Gazette and Atlas are the same paper, whilst the proprietors disclose facts which show that so far at least as this question is involved, the subsequent publication of the notice of the sale in the Atlas might with as much propriety have been made in any other weekly newspaper published in the city of St. Louis. They say that the Evening Gazette is a daily commercial paper, intended, and in fact confined in its circulation to the city, whilst the Atlas is a weekly paper, for country circulation, and having scarcely any patronage in the city.

Other points were presented in the case which we do not now undertake to decide, as the one discussed by us is conclusive of this case. We are then of opinion that the Circuit Court committed no error in its decree made herein, and Judge Scott concurring, the decree of the Circuit Court of St. Louis county is affirmed.