HENRY L. PATTERSON, Respondent, v. MARGARET FAGAN et al., Appellants.

1. *Lands—Public Schools—Survey.*—The survey and setting apart to the use of schools, by the Surveyor General, of a lot reserved for the use of schools by the acts of Congress of June 13, 1812, January 27, 1831, and May 26, 1824, passed to the Schools the title of the United States.  The acts of Congress and the survey are equivalent to a patent, and all previous steps required by law are to be presumed.  No limitation as to the time of the survey was prescribed by the act of May 26, 1824.

2. *Depositions in perpetuam—Notice.*—The statute R. C. 1825, p. 617, in relation to the perpetuation of testimony, required that the notice, when given by publication, should be published once a week for one month, at least two months previous to the day of taking the depositions.  A deposition to perpetuate testimony, although recorded, which does not show such notice, cannot be read in evidence.  In case of depositions taken *in perpetuam*, the forms of the law under which they are taken must be strictly pursued, or they cannot be read in evidence.  Under the act R. C. 1825, p. 617, it must appear that "the questions and answers were reduced to writing, as near as possible, in the words of the witness," that the deposition was distinctly read over to said witness, and that the deposition was forwarded to the clerk of the  Circuit Court within thirty days, for the purpose of being recorded.

3. *Lands— Concessions — Evidence.* — A concession of a lot by the French or Spanish Governments, is of itself no evidence to prove a title by virtue of inhabitation, cultivation and possession prior to the 20th December, 1803.

4. *Conveyances — Evidence.* — An instrument affecting lands, the execution of which is not proved in accordance with the statute, is not entitled to be recorded, and a certified copy of the record is not admissible in evidence.

5. *Evidence—Hearsay.*—The affidavits of persons who are competent witnesses in a suit, are inadmissible as evidence.

6. *Evidence — Instrument — Alterations.* — An instrument appearing upon its face to have received material alterations, cannot be admitted in evidence until the alterations are explained.

   [Patterson v. Butler et als., on same facts, affirmed.]

## Appeal from St. Louis Circuit Court.

*Jewett*, *E. B. Ewing* and *G. P. Strong*, for appellant

I. The assignment and survey in question, made in 1837,

were not in accordance with the then existing laws. This court has decided that a certificate of confirmation issued by Hunt's successor in 1839, could not be read in evidence to establish title in the claimant. Defendants insist, therefore, that the survey in question could not be read in evidence against defendants, claiming title by virtue of the act of Congress of 13th June, 1812. No descriptive list, as contemplated by the act of Congress of 26th May, 1824, had been shown, and nothing shown to explain the reason why the Surveyor General had not surveyed the land in question within the time required by law.

II. Plaintiff's objection to the depositions *in perpetuam*—to-wit, the want of notice—presents two questions, viz : Was the plaintiff, or those under whom he claims, in a condition to insist upon notice ? * * * *

It was admitted that due search had been made, and no other notice could be found. Moore swears that he had seen two notices. Defendants insist that, so far as notice was concerned, this was sufficient and more than could have been required by reasonable minds. In the case of Garwood v. Dennis, 4 *Binn.*, Pa., the Supreme Court, in deciding that recitals in ancient deeds are evidence against all persons of the existence of a former deed, of the loss of which some evidence had been given, say, that " necessity, either absolute or moral, is a sufficient ground for dispensing with the usual rules of evidence."—"After the lapse of thirty years from the execution of a deed, the witnesses are presumed to be dead. It is a rule adopted by common convenience, and founded upon the great difficulty of proving the due execution of a deed after an interval of many years"—9 Pet. 663; 4 Wheat. 213 ; 4 Cond. 426 ; Doe v. Deakin et al., 14 Eng. Com. Law, 369.

But was the plaintiff in a condition to insist on notice ? We contend not. In the case of Braham v. Debrul, 1 Ala. 14, the Supreme Court say, that " if it appears that no injury can possibly result from the omission to give notice, the courts have as uniformly held, that it shall not exclude the

deposition."—1 Wright, 513; 1 Bibb, 89; Overton v. Lackey et al., 1 Cook, 196; Bustard v. Gates & wife, 4 Dana, 429; 3 Binn. 26.

But supposing that some irregularities were apparent upon the face of these proceedings, it might be presumed, since more than twenty years had elapsed, that the necessary notices were given, and the proceedings of the court and commissioner were in due form—Barnett's Exec'r v. Tarrence, 23 Ala. 463; Grant's Adm'r v. Phillips, 23 Ala. 275; 2 La. Ann. 509, 503; 27 Mo. 579; and authorities before cited.

III. Defendants insist that the affidavit of Skinner was competent and relevant, 1st, to prove that he was agent of the parties concerned in perpetuating this evidence; 2d, that as agent he gave due notice; 3d, to prove what kind of notice was given, whether by publication or otherwise; 4th, whether or not any person was known to be interested, so the court might be enabled to judge what kind of notice should be given, if any, to prove that the depositions were taken according to, and in compliance with, the statute—R. C. 1825, p. 630, § 34; 3 Marsh. 558; 5 Dana, 343; 1 S. & M. Ch. 37.

IV. Paschall's affidavit was competent and relevant to prove the fact, that the petition and notice of English were published in his paper in 1829.

Defendants insist that upon the whole case, as presented by the records of St. Louis county, in connection with Skinner's and Paschall's affidavits, and also the testimony of Moore, who has been in possession of a large and valuable portion of said common-field lot, claiming under the same title as the defendants, since 1831, more than thirty years, that the testimony of Dodier and Baccané ought to have been received in evidence in this cause. Defendants, in this connection, refer to 6 Ark. 401; 3 Dane Abr. 373; 4 Maul. & Sel. 486, 497; 3 Day's Ca. 308; 10 Mod. 15; 6 Esp. 87; 6 Pet. 729; 4 Dana, 205; 3 Conn. 171; 16 id. 588; Breese, 256; 12 Ills. 272; 2 Scam. 10; 1 Gilm. 64; Peak's Ev. 67, 68; 2 Dessaus. 456; Riley, 102; 2 Bosw. 267; 5 Ala. 202; ·

3 Marsh, 558; 5 Ala. 290; 7 Ala. 630, 652, 927; 4 Dev. 180; 2 Yerg. 108; 4 Sandf. Ch. 633; 27 Mo. 452; 17 Eng. Com. L. 300; 15 id. 150; 14 id. 369; 6 Cow. 178; 4 Wend. 277; 3 J. C. 283; 1 Spear, 191.

VI. & VII. The petition of Chartrau, and concession to him by Cruzat, and Chartrau's written acknowledgment of sale of the land to Mackay, were competent evidence as title papers, they being more than thirty years old—R. C. 1855, p. 733, § 58, and authorities before cited.

VIII. The court erred in rejecting Chartrau's agreement and acknowledgment of sale to Mackay—1. Because, prior to 1816, at which time the common law was introduced by statute in this State, a verbal sale of real estate would pass title. Although it was not a deed, it was sufficient to pass all the title in Chartrau to Mackay. 2. The alleged interlining was no objection to its being read in evidence—9 Cranch, 28; 3 Cond. 244.

IX. & X. The certified copy of certain extracts from Hunt's minutes, relating to the occupation and cultivation of the land in controversy prior to December, 1803, were admissible to show the possession of the land.

*T. T. Gantt,* for respondent.

I. The assignment to the Schools; the deed of the corporation to Mary and Margaret Thomas; their deed to Martin Thomas and Henry L. Patterson, trustees; the death in 1848 of Martin Thomas; the possession of the premises by the defendants; the agreement as to value; and the admission that the premises were included both in the boundaries of the land assigned to the Schools, and in the boundaries of the land conveyed by the Schools to Mary and Margaret Thomas, made out a complete *prima facie* title.

II. The defendants did nothing to impeach this title. There is nothing whatever that can be supposed to have any such effect, except the testimony (so called) of Dodier and Baccané. This testimony purported to have been taken in 1829, upon a *dedimus,* issued on an application to the judge

of the St. Louis Circuit Court, of Thomas English. It was in evidence that the following notice was published in the " Missouri Republican" once, and no more, on the 19th of May, 1829:

" *To all whom it may concern.*—Notice is hereby given, that on the 27th and 28th days of July, and on the 28th and 29th days of August next, at the office of the clerk of the Circuit Court of the county of St. Louis, and on the 30th and 31st days of August next, at the office of the clerk of the St. Charles Circuit Court, in St. Charles, between the hours of eight o'clock in the forenoon and six in the afternoon of each of said days, I shall take the deposition of witnesses named in the annexed petition, and others, to prove and establish the facts in said petition alleged as intended to be proved, under and by virtue of a commission issued pursuant to an act directing the mode of perpetuating testimony in this State.—St. Louis, May 19, 1829.

THOMAS ENGLISH."

The statute in force in Missouri in 1829, on the subject of perpetuating testimony, is found at p. 616 and following of the Acts of 1825 (R. C.) On p. 617, it is declared to be " the duty of the person or persons praying for a *dedimus* for the purposes before mentioned, before proceeding to take the deposition or depositions, to give one month's previous notice, with a copy of the petition, to each and every person that may be known to be interested in the matter to be the subject of the deposition or depositions, or to his, her or their attorney; or, in case the person be a married woman, the notice to be served on her husband; or if a minor, to be served on his or her guardian; or if he or she should have no guardian, or the guardian should be interested, then a guardian to be chosen by the court for that purpose; and the said notice shall contain information," &c., &c. "Or, in lieu of written notice, he, she or they shall cause the notice, in form as afore-mentioned, with a copy of the petition, addressed to whom it may concern, to be published once a week for one month, which shall be at least two months previous to the

day of taking such depositions, in at least one of the public newspapers printed in this State."

§ 2. * * * "And all the questions and answers shall be reduced to writing and included in such deposition. And the deposition being reduced to writing in the English language, or the language of the deponent [if he] does not understand the English language, and, moreover, as near as possible in the very words of the witness, and distinctly read over to said witness, and subscribed by such witness, the said justice of the peace shall," &c., &c., " certify the same deposition," &c.

§ 3 declares that such depositions, " taken in manner and form, and certified as in this act before mentioned, * * * may, in case of death, * * * be used as evidence in any case to which it may relate. Provided, that nothing in this act contained shall be so construed as to prevent any and all legal exceptions being made and allowed to the reading of such deposition on any trial, at law or in equity, in which the same may be introduced as evidence."

There are three fatal objections to the admissibility, under the statute, of these depositions. 1. No such notice as the statute requires appears to have been given. The only attempt at notice was by publication, and there was only one publication. The statute requires four, at intervals of a week. 2. The statute requires the "questions and answers to be reduced to writing, and included in such deposition." 3. The statute requires the deposition thus carefully taken, "in the very words of the witness," "to be distinctly read over" to him; it is then to be subscribed and sworn to, and certified.

The deposition appears in a narrative form, and it appears that neither witness could sign his name. It does not appear that the deposition, after being written down, was read to the witnesses. Everything required by the statute must appear affirmatively, or else the presumption is against the deposition—Bell v. Morrison, 1 Pet. 351, 355; Harris v. Wall, 7 How. 704.

The testimony of Blackman simply proves that there was only one publication of the notice. The affidavit of Skinner was incompetent: what he stated was indeed irrelevant; but, if it had been relevant, he should have been examined either on notice to the plaintiff, or produced in open court.

The affidavit of Mr. Paschall may be dismissed in as few words. The statute (R. C. 1855, p. 180, § 1) never intended to allow any one but the publisher of a paper during the time when the publication took place, to make an affidavit, which may be read in evidence by virtue of its provisions.

The copy of the contract between Chartrau and Mackay, and the original itself, were both before the Circuit Court. The court excluded them from its consideration, on two grounds: 1. The contract was entirely irrelevant, Chartrau not being shown to have any interest in the land in controversy. 2. The original contract bore on its face palpable proof of corrupt alteration; and it did not appear to have been executed by Chartrau. No explanation was offered, and no testimony given, in this connection.

HOLMES, Judge, delivered the opinion of the court.

This was an action of ejectment, to recover possession of a lot situated within the U. S. survey No. 3003 of St. Louis lands. The plaintiff claimed title under a survey and designation to the St. Louis Public Schools. The answers merely denied the wrongful entry and the plaintiff's right to the possession.

The plaintiff relied upon the survey and assignment of the land contained in the survey No. 3003 to the Schools, made in 1837, and upon the acts of Congress vesting title under said survey.

The defendants objected to the admission of this survey and designation, on the ground that it was no compliance with the act of Congress of the 26th of May, 1824, so as to confer title on the Schools. They relied also upon a supposed confirmation by the act of Congress of June 13, 1812, on the ground of inhabitation, cultivation or possession of the com-

mon-field lot in question by one James Mackay, prior to the 20th of December, 1803. In support of this claim of title, they offered in evidence—

1. Certain depositions *in perpetuam*, taken under the statute of 1825, together with a certified copy of the record of the same from the office of the recorder of the. county of St. Louis, having no notice attached thereto or recorded therewith.

2. Certain affidavits respecting the notice and the publication thereof, with the testimony of a witness in relation to his examination of the files of the "Republican" newspaper for a publication of notice therein.

3. A Spanish concession to Joseph Chartrau, dated April 29, 1778, together with a certified copy of the same from the office of the recorder of said county, as recorded in 1818, as tending to show occupation, cultivation and possession prior to 1803, and a claim of title.

4. A contract between Joseph Chartrau and James Mackay, dated August 24, 1804, with a certified copy of the same from the recorder's office of said county, as recorded in 1818, the original of which appeared on its face to have been materially interlined in another handwriting and a different ink, without any explanation thereof.

5. A certified extract from Recorder Hunt's Minutes of Testimony, taken July 30, 1825, under the act of Congress of May 26, 1824, together with a copy of a letter of the Surveyor General to the Commissioner of the General Land Office, as tending to show that the survey and designation of the lot contained in survey No. 3003 to' the Schools was improperly made, so late as the year 1837, and gave no title to the Schools.

All these documents were excluded. There were no instructions.

The questions presented by the exceptions taken will be considered in their order. And first, as to the survey and designation of this land to the Schools. This matter may be regarded as settled and determined by the former adjudica-

tions of this court. In Kissell v. Public Schools, 16 Mo. 553, the subject was thoroughly examined, and it was decided that the acts of Congress of 1824 and 1831, and a survey officially made, under instructions from the General Land Office, designating and setting apart a particular lot to the Schools, passed to them the whole title of the Government, legal and equitable. The acts and the survey were considered as equivalent to a patent, where all previous steps required by law before its emanation are to be presumed. The fact that the survey was made after the year 1831 was not deemed material. It was held that the survey and the act of 1831 showed a legal title in complete form, and that it devolved on the adverse party to show a better title, or that the title thus set up against him was null and void. It is contended that this survey is null and void, for the reason that the authority of the Surveyor General to make it, in 1837, had expired. No definite limitation of the time is prescribed by the act of 1824; but it is made the duty of the Surveyor General to proceed, "immediately after the expiration" of the term allowed for proving claims before the Recorder of Land Titles, to make the proper surveys and designations to the Schools; and the Recorder, "so soon as the said term shall have expired," was to furnish the Surveyor General with a list of the lots so proved before him, "to serve as his guide in distinguishing them from the vacant lots to be set apart" to the Schools. These proved lots are not to be set apart to the Schools. Vacant lots only can be so set apart and surveyed and designated for the Schools. But it does not by any means follow, that all lots not so proved are to be considered as vacant lots, and subject to be assigned to the Schools. It has been uniformly held, that the fact of inhabitation, cultivation, or possession, and the location and boundaries of the lot, may be proved in the courts by any competent evidence, and that such lots were confirmed by the act of 1812, directly, presently, and by its own immediate force. A survey and designation of such a lot to the Schools would be unquestionably null and void; and when such proof shall be made,

the survey and designation to the Schools will be completely rebutted and avoided. The power and duty of making these official surveys belong to the executive department of the Government. Whether or not there can be any limit to its exercise, in point of time, short of exhaustion in a full execution of the power and a complete performance of the duty, it will be unnecessary for us to undertake to determine now; but we are of opinion that both the power and the duty still existed in 1837, when this survey was made.

As to the depositions *in perpetuam*, there can scarcely be any room for doubt that they were properly excluded. The statute expressly required that the notice, when given by publication, should be published "once a week for one month," which should be at least two months previous to the day of taking such depositions. No such publication was shown by the evidence ; on the contrary, it tended strongly to show that the notice had never been inserted but once. Neither the certificate of the clerk nor the deposition showed that the "questions and answers" were reduced to writing "as near as possible in the very words of the witness"; nor that the deposition was "distinctly read over to said witness" ; nor does it appear that the depositions were "forwarded to the clerk of the Circuit Court within thirty days," for the purpose of being recorded. They were not in fact recorded until more than eighteen months after they were taken. All these things were required by the words of the statute—R. C. 1825, p. 617.

The rule must be considered as established beyond question, that, in case of depositions taken *in perpetuam*, the forms of the law under which they are taken must be strictly pursued, or they cannot be read in evidence—1 Greenl. Ev. § 552. "The authority to take depositions in this manner has always been construed strictly," says Mr. Justice Story, "and therefore it is necessary to establish that all the requisites of the law have been complied with, before such testimony is admissible"—Bell v. Morrison, 1 Pet. 351. And of this there must be distinct proof: no just presumption can

be made in favor of it. The authority of the magistrate must appear on the face of the instrument, and what must so appear cannot be supplied by parol proof—Harris v. Wall, 7 How., U. S. 704. The notice is the most material thing of all. The proceeding is one against strangers who can be no otherwise parties to it, and by force of the statute itself. Without notice, there is no opportunity for cross-examination, and the statements made are mere hearsay. Where the notice is by publication, it must be made in strict accordance with the statute. A publication by one insertion only, when the law required as many as four, was no better than no publication at all. Even in case of a sale under an ordinary deed of trust, where a continuous publication is required, one insertion will not be sufficient—Stine v. Wilkison, 10 Mo. 75. In Bell v. Morrison, the deposition was excluded because the certificate of the officer did not state that the deposition was reduced to writing " in his presence." The same strictness would exclude this deposition for the reason that the certificate did not state that the depositions, when reduced to writing, were distinctly read over to the witnesses, and also for the reason that the questions and answers were not " reduced to writing, and included in said deposition." It is equally clear that the express requirement of the statute, that the deposition should be forwarded within thirty days to the clerk of the Circuit Court for record, was not strictly complied with. The clerk who took the deposition was also the *ex officio* recorder; but, though the deposition remained in his possession, the result is the same; for it is evident that the duty was not performed, whatever may have been the reason. The want of a proper publication of notice may have been the very reason of the omission; and it would be a sufficient reason.

It is argued that the officer had jurisdiction and authority to take the deposition, and that being taken under an order of court upon a petition presented for the purpose, under the statute, the proceeding was in some sort judicial in its nature, and that everything necessary in respect of notice, and other

mere formalities, ought therefore to be presumed to have been rightly done. This principle has been recognized in certain cases, in respect of judicial proceedings of courts of general jurisdiction, and in support of judicial sales therein, where the proper parties were before the court, or where an actual service or citation must have been made, or might have been waived—Gibson v. Foster, 2 La. Ann. 508. But this was not a judicial proceeding of that kind. Here, there could be no party defendant without notice, or an actual appearance. But this doctrine is not applied to courts of limited and special jurisdiction, much less to a mere commission to take a deposition *iu perpetuam*. In Grignon v. Astor, 2 How., U. S. 319, it was said by Baldwin, J., that where a court is so constituted that its judgment can be looked through for the facts and evidence which are necessary to sustain it, and whose decision is not evidence of itself to show jurisdiction and its lawful exercise, every requisite for either must appear on the face of the proceedings, or they are nullities. There is still greater reason for the application of the principle in a case of this kind.

It is contended, also, that the act required notice to be given to those only who were interested; that the Schools had then no interest in this land; and that it was not necessary to give notice to the United States. We do not see much force in these arguments. It is true, the Government was then the owner of the legal title, unless the same had been granted to some individual. As such, it stood in the same position as any private owner. The lot, if vacant, was reserved, and the Schools hold in privity with the title of the United States.

The statute is compared with the act of Congress in relation to the Recorder of Land Titles, which did not require any other notice to claimants than the act itself. This act was a public law, and it gave full power and authority to the Recorder to proceed in the manner pointed out by the act. His action bore chiefly on the title and the interest of the Government. In reference to claimants, the act itself was

public notice to all concerned. No particular notice was required. This statute of 1825 was a public act; but it gave no more power or authority than is therein expressed. It expressly required notice as a condition precedent of the power and authority that were given; and the rules of legal construction demand a strict compliance with all its provisions. It does not operate merely upon any title of the State, but affects the rights and interests of private owners and claimants. It was simply a commission to take depositions *in perpetuam*, which is a proceeding in derogation of common law; and such being the nature of it, it must be governed by the principles of law applicable to such cases.

It was urged, also, that it might be read as an ancient document, or deed, in support of an ancient possession. This cannot avail. There is not even a plausible analogy between this and such a case. Neither can it be admitted as hearsay declarations of deceased persons, as in cases of pedigree, or as reputation, as in cases of ancient rights or boundaries. It is not offered for any such purpose, but to establish title in a matter of private right, where a controversy had already arisen. It must stand or fall as a deposition, and nothing else; and as such we think it was clearly inadmissible.

It can scarcely be necessary to notice the several affidavits which were offered to prove notice. They were not admissible evidence for any purpose. The persons who made them might have been called as witnesses. The affidavit of the printer was not admissible under the statute, which evidently relates only to the printer or publisher who makes the publication, and in whose personal knowledge the facts are supposed to lie. Of the facts in question here, he could have no more knowledge than any other man might learn from an examination of the files of the newspaper. If a competent witness otherwise, he should have been called as such.

It appears that the concession to Chartrau was offered for the purpose of proving an occupation, cultivation and possession of the lot prior to 1803, with a claim of title. It could have no tendency to prove such fact; and as showing

Patterson v. Fagan et al.

a claim of title, it was of no importance by itself. It did not appear to have come from the Spanish archives, and there was nothing to show that it was ever entitled to be recorded. It is claimed that it came within the 58th section of the "Act concerning evidence" (R. C. 1855, p. 733), which dispenses with proof of the execution and genuineness of any writing, instrument, or deed, affecting real estate, where such real estate, or any right or interest in the same, shall have been claimed and enjoyed by any person by or through such writing, instrument, or deed, for a period of ten consecutive years after the recording of the same. It is very questionable whether this was such an instrument at all. No estate, right or interest in the land could be claimed and enjoyed by or through this writing alone.

The defendants were endeavoring to show a title by confirmation under the act of 1812 : that title rested, and alone could rest, on the act and the fact of inhabitation, cultivation, or possession, prior to 1803, actually proved. It has been repeatedly decided, that no concession, survey, or other title paper, from the Spanish government, need be shown in such case. The bare fact of inhabitation, cultivation, or possession, is enough, together with the existence of a lot with a given extent and boundary. These concessions, when shown to have come from the proper source, have been admitted as evidence for some purposes, as to show the existence of a lot, and its location and boundaries, and the identity of the lot claimed with that proved to have been inhabited, cultivated, or possessed. But it is not an instrument which, of itself, gives any real estate, or any right, title or interest in real estate, or by or through which alone any such estate or interest could be claimed and enjoyed, otherwise than as a permissive possession merely, under the former government. There was no time after the recording of it, when any estate or interest in this lot could have been held, claimed, and enjoyed, under this paper alone. There being no proof of the facts necessary to give title under the act of Congress, the

exclusion of this document, even if by any construction it could be brought within that section, was immaterial.

The paper called a contract of Chartrau with Mackay was rightly excluded also. It was not entitled to be recorded. There was no proof of its execution. It was admitted to have been materially interlined, without any attempt at explanation. It did not purport to convey any title, interest, or estate in the land in controversy. We think it was wholly inadmissible on the issues made.

The certified extract from Recorder Hunt's minutes, containing the testimony of two witnesses, not in proof of any particular lot in claim, but in relation to the St. Louis prairie common-field in general, and giving the order of the several lots, with the names of the respective cultivators, prior to 1803, was offered in evidence by the defendants, as it is stated, for the purpose of showing that the survey and designation of this lot to the Schools, in 1837, was improperly made, and gave no title. It is not apparent how it was conceived that this document could have any such tendency. The only thing contained in it which could be imagined to have any bearing on the lot in controversy, was the bare mention of the name of one Viferenne, as a cultivator between Condé and Guion, at some period prior to the change of government. It does not show that Viferenne, or any one else, ever claimed or proved this lot before Recorder Hunt. The witness stated that the persons named in the list owned and cultivated these several field lots "forty years ago and upwards," and that "they continued under cultivation for many years." Notwithstanding all that is here stated, this lot may have been abandoned, and left vacant, long before 1803. The survey and designation were at least *prima facie* evidence that the lot had become vacant. There is nothing in this paper which tends in any way to rebut that presumption, much less to show that the Surveyor General had no authority to make the survey and designation. This being so, it becomes wholly unnecessary to consider for what

Deitz v. Mound City Mut. Fire & Life Ins. Co.

purposes, or to what extent, these minutes of testimony may be admissible in evidence in any case.   We think this document, as well as the letter of the Surveyor General, offered for the same purpose, were properly excluded.

There being no material error in the action of the court below, the judgment will be affirmed.   Judge Wagner concurs ; Judge Lovelace absent.