SOUTH HIGHLAND LAND & IMPROVEMENT COMPANY, Appellant, v. KANSAS CITY et al.

In Banc, March 4, 1903.

1. **Cities:** JOINT SEWER DISTRICT: EXHAUSTION OF AUTHORITY. Kansas City has authority to group 105 sewer districts, embracing one-fourth the area of the city, into a joint sewer district and to construct a joint district sewer therein, and to require the cost thereof to be paid in special taxbills against the property in such joint district; nor was that authority exhausted by the fact that it had once before been exercised to the extent of grouping two or three of said districts into a joint district and the construction of a joint district sewer therein and the levying the cost thereof on the land therein. The city has the power to first group a number of districts into a small joint district, or otherwise plan the districts or joint district, so as to meet the necessities of the time, and afterwards as that portion of the city becomes more densely inhabited or otherwise expands, it can group those small districts into a main joint district, and levy the cost of district sewers against the land therein, although it had been previously taxed for the first joint district sewer, which by the new plan, is made to drain into the main joint sewer.

2. ———: ———: ———: LIMITATION. The only limit on the city's power as to the number of sewer districts it may embrace in a joint district is the requirement that they shall all be in one natural drainage area.

3. ———: ———: OUTLET. The duty of a city in respect to its sewers is not performed until it has given them an outlet.

4. ———: ———: COSTS. As long as the sewers of a city retain the character of either district or joint district sewers, as distinguished from public sewers, their costs may be taxed against the lands exclusively drained by them.

5. ———: ———: SUBDIVISION: CHANGE: RETAXATION. Under the charter of Kansas City, land once taxed to build a district or

joint district sewer can not be taken out of such district or joint district, nor deprived of the use of the same, nor can it be placed in another similar district or joint district and subjected a second time to a like burden, nor can lands which were not in the district or joint district when the sewers were built be added to either and have a benefit for which it paid nothing. But the charter in saying "no district sewer district shall be subdivided or changed after a district sewer shall have been constructed therein" and that "joint district sewers shall be constructed in like manner in all respects as district sewers," did not mean that land which has been taxed for the sewer system as far as the system has gone may not be taxed for the extension of the system.

6. ——: ——: MISNAMED. If a sewer is in fact a public sewer the city council can not by merely naming it a joint district sewer make it such.

7. ——: ——: MEANING OF WORDS. The terms "public," "district" and "joint district," applied to sewers in a city's charter, if not therein defined, are to be construed in their natural and common meaning.

8. ——: ——: PUBLIC SEWER. A public sewer is one open and available to the whole city and not limited to any particular part thereof. If the sewer is available as a means of drainage to an area less than the whole city, especially if it is exclusively reserved for the drainage of an area less than the whole, even if it were physically possible to drain the whole into it, it is not a public sewer. Its dimensions do not distinguish its kind.

9. ——: ——: ——: FACTS STATED. A sewer serves as an outlet to the district sewers in 105 districts, which embrace one-fourth in area of Kansas City; its need is imperative for the public health; it is over a mile long, and it is an extension at the lower end of a sewer already declared to be a public sewer and built and established as such. Held, a joint district, and not a public sewer.

10. ——: ——: ——: EXTENSION OF PUBLIC SEWER. The fact that a sewer is an extension of a sewer that was designated a public sewer in the ordinance establishing it and that was paid for out of the city treasury, does not make such extension a public sewer. If the old sewer was not in fact a public sewer, paying for it by appropriations out of the city treasury, when in fact it was chargeable alone on property in the district, does not make the subsequent extension a public sewer, nor bind the city to pay for it out of its general revenue.

11. ——: ——: OUTLET TO RIVER: ACCRETIONS. Kansas City has power under its charter to open the way for a sewer to the river through accretions that may impede its outlet.

Appeal from Jackson Circuit Court.—*Hon. J. H. Slover,* Judge.

AFFIRMED.

*Cook & Gossett* for appellant.

(1)   This sewer serves one-fourth in area of the entire city; its need is imperative for the public health; it is over a mile long and it is an extension—the lower end of a sewer already declared to be and established and built as a public sewer.  The two together necessarily constitute one great public sewer.  The extension of a sewer (or artificial river) towards its final receptacle, like a natural river to the sea, both being for drainage, can not (as a natural fact, consequently as logical and irresistible conclusion of law) be any less in character or public nature than any section above it of the whole of which it is a part.  It can not be contended that the council could build a sewer in each city block and pay for it out of the general revenue fund simply by passing an ordinance for each of such calling it a public sewer.  No more can it call a "public" sewer a "district" or "joint district" sewer and compel payment by special assessment.  St. Louis v. Heizeberg, 141 Mo. 375; Hill v. Swingley, 159 Mo. 45. If the provisions of section 11, article 8, of the charter were intended to give the city this power, it is unconstitutional as depriving of his day in court him whose property is so specially assessed to build a "public" sewer under name of a "joint district" sewer.  Abbott v. Linderbower, 42 Mo. 162.  While it may pass conclusively upon the "size, character and purpose" of a sewer, just as it may pass conclusively upon the expediency of a district sewer, as in case of Johnson v. Duer, 115 Mo. 366; yet it could not legally make special assessments to pay for a sewer without an outlet, or for a sidewalk where there is no population to use it, or for its construction of precious metals.  Its ordinances must be reasonable and not subterfuges.

Corrigan v. Gage, 68 Mo. 541; Kansas City v. Richards, 34 Mo. App. 276; Copeland v. St. Joseph, 126 Mo. 417; Skinker v. Herman, 148 Mo. 365; Herman v. Allen, 156 Mo. 544. (2) The proposed sewer is to be constructed to empty and have its end upon filled, i. e., accreted land in possession of a private person. Presumptively such possession is rightful. Such a sewer is a nuisance and wrongful and the city has no power to tax for such purpose. Edmondson v. Moberly, 98 Mo. 523; Schoen v. Kansas City, 65 Mo. 134; St. Joseph v. Wilshire, 47 Mo. 125.

*R. J. Ingraham* and *Clarence S. Palmer* for respondents.

(1) It can be no objection that a part of this district may have been included in other joint districts. In the valley along the course of this sewer, other smaller valleys may and do enter, and if some of these joint district sewers had been constructed to embrace different district sewers, they might be in the drainage of these smaller valleys. The exercise of the authority of the city in these cases does not deprive it from meeting new conditions as they arise. The exercise of the power to pave a street does not deprive the city authorities of the power of having it repaved, although both paving and repaving are assessed against the property fronting on the street. McCormack v. Patchin, 53 Mo. 33. And the case of the sewer is still stronger, because in the case of paving a street, it is the exercise of authority to do over again, the same thing which has been done before, while in the case of combining sewer districts into joint sewer districts, there is a different grouping of the districts according to the particular territory to be drained, and all subject to the just limitation that no district can be included in a joint sewer district which is not in the same drainage area in which a sewer is to be built. (2) The objection that beyond the mouth of the sewer the Mississippi river has par-

tially been filled, can constitute no objection to the building of the sewer in question. There is no allegation that the condition is such that a nuisance will be created by the construction of the sewer. It has been held by this court in the case of Johnson v. Duer, 115 Mo. 366, that where a part of a sewer was actually built upon private land, it would constitute no defense to the taxbills for the portion of the sewer built upon public property. If a nuisance is ever caused it will be the duty of the city, of course, to abate the nuisance, but in this case, all of the sewer is built upon public property, the outlet was in the bank of the Missouri river at the time the Santa Fe sewer, now discharging at that point, was constructed. The ordinance shows that the entire course of this portion of the sewer is upon Santa Fe street, and the accretions opposite the end of the street would belong to the city and not to the private property-owner. Tatum v. St. Louis, 125 Mo. 647; Whyte v. St. Louis, 153 Mo. 80; Benne v. Miller, 149 Mo. 228; De Lassus v. Faherty, 164 Mo. 361.

VALLIANT, J.—This is a suit in equity to enjoin the defendant city and its officers from letting a contract to construct a joint district sewer. The cause was submitted to the court upon an agreed statement of facts in substance as follows:

The common council of the city passed an ordinance, No. 16253, entitled, "An ordinance to establish a joint sewer district composed of the following sewer districts [specifying 105 in number] and to construct a joint district sewer therein." The ordinance describes the district by metes and bounds. It embraces 4,200 acres, which is shown to be one-fourth of the area of the city. The whole 4,200 acres are embraced in the same natural drainage area of the valley and watercourse in which the proposed joint district sewer is to be built.

In many of the 105 sewer districts named, sewers have been constructed and paid for through special taxbills, and thirty-five of these are embraced in joint

sewer districts composed of two or more districts, all of which are to drain into the joint district sewer proposed to be constructed under the ordinance in question.

The outlet of the proposed sewer is the outlet of what is designated in the record as the Santa Fe Street sewer, whose outlet is, or was when constructed, the Missouri river, but since its construction the river at that point has "been partially filled by a land reclamation company for some considerable distance beyond the mouth of the sewer; and such filled land is claimed by and in possession of such company." The Santa Fe Street sewer has been emptying into the river at the foot of that street for many years and the city has never given its consent to have the river filled in at that point.

In 1889 an ordinance was passed submitting to the vote of the people a proposition to issue city bonds to the amount of $500,000, three-fifths of the proceeds of which were to be used in building a city hall and the balance in "the construction of a public sewer in said city along or near O. K. Creek." The proposition carried, the bonds were issued and two-fifths of the proceeds were used in 1893 in the construction of such sewer for a considerable distance, but it was left unfinished for the rest of the route, and the purpose of the ordinance now in question is to complete that sewer. Since 1893, when that portion of the sewer was built with the proceeds of the bonds mentioned, there have been constructed and paid for out of the general city revenue two other sections of this sewer under ordinances of the city designating it as a public sewer. The sewer as far as constructed drains territory only within the limits defined by the ordinance in question and when completed as now proposed will drain territory only within those limits.

The charter of the city, article 9, provides for the construction of a sewer system composed of "public, district, joint district and private sewers."

"Sec. 9. Public sewers shall be established and constructed at such times, to such extent, of such di-

mensions and materials, as may be approved by the board of public works, and under such regulations as may be provided by ordinance, and these may be extensions or branches of sewers already constructed or to be constructed, or entirely new throughout, as may be deemed expedient. Public sewers shall be paid for out of the general fund of the city; provided;'' etc.

''Sec. 10. District sewers shall be constructed within the limits of districts heretofore or hereafter established by ordinance, as each case may be,'' etc. That section also provides that district sewers shall be paid for in special taxbills against the land in the district.

''Sec. 11. Joint district sewers may be constructed by the city as follows: Whenever the city may deem it necessary that a sewer should be constructed in any part of the city containing two or more sewer districts it may, by ordinance, unite such sewer districts into a joint sewer district and cause a sewer to be constructed therein in like manner in all respects as is provided in section ten of this article in cases of district sewers, except in cases of joint district sewers the city may, if deemed proper, provide in the ordinance creating such joint district sewer, that the city shall pay a certain sum to be specified in said ordinance toward the payment of the cost of such joint district sewer.'' That section further provides that the cost of constructing the joint district sewer, except the sum, if any, specified in the ordinance to be paid by the city, is to be paid in special taxbills against property in the joint district. It also provides that the action of the common council creating the joint sewer district shall be conclusive and no special taxbills shall be held invalid or be affected on account of the included drainage area thereof, or the size, character or purpose of such sewer; provided, it shall not include any district not contained in its natural drainage area or watercourse.

The estimated cost of the proposed joint district sewer is $100,000. Plaintiff owns about 100 acres of

Vol 172 mo—34.

the 4,200 acres embraced in the proposed joint district.

The city had advertised for bids and was about to enter into a contract for the construction of the joint district sewer when this suit was begun and a temporary injunction was issued as prayed. It was conceded that if the city had no right to have this sewer constructed and paid for in special taxbills, the construction of the sewer and the issuance of the taxbills would be a cloud on plaintiff's title and would put plaintiff in danger of a multitude of suits and that therefore plaintiff would be entitled to the relief prayed.

On the agreed statement the court rendered judgment for defendants, dissolving the temporary injunction and dismissing plaintiff's bill. Plaintiff filed a motion for new trial which was overruled, whereupon this appeal was taken.

The authority of the city to make sewer districts and construct sewers therein, the cost to be paid in special taxbills against the land in the respective districts, is not questioned. And the authority to group any number of such sewer districts into a joint sewer district and to construct a joint district sewer therein, the cost to be paid in special taxbills against the property in such joint district, is also undisputed. But it is contended that when such authority has once been exercised to the extent of grouping two or three districts into a joint district and a joint district sewer is therein constructed and the cost thereof levied on the land in that joint district, the authority of the city is exhausted. If that is the law then the authority is very inadequate to meet the necessities of a growing city.

In such case if there was in the outskirts of the city a thinly-settled area of considerable size having a common natural drainage, if the city should construct a system of district and joint district sewers sufficient only to meet the necessities of the time, it would thereby render itself impotent to provide for the necessities of that portion of its domain when it should afterwards become densely inhabited. And in such case the city

must either anticipate the development in that direction and construct a sewer system equal to all possible future demands, or else make no sewers at all until the development has taken place.

The charter does not limit the city government in the matter of the number of sewer districts it may embrace in a joint sewer district, provided they are all in one natural drainage area. That is left as a matter of policy to the lawmaking department of the city government, and its reasonable discretion in that respect is not the subject of review by the courts. We do not understand appellant to question that the city might lawfully have embraced all these 105 districts in one joint district if it had not previously united some of them in smaller joint districts. If the city had the power in the first place to embrace them all in one joint district, it had the power to prescribe the plan or system by which they could all be so united, and if, in so doing, its engineer had deemed it best to first group a number of districts into smaller joint districts and then group those smaller joint districts into the main joint district, no one would have the right to dictate to the city that it should plan the system differently. As the cost of district sewers may be taxed against the land in the district, because that land alone is drained through such sewer, so may the cost of the small joint district sewer be taxed against the land embraced in its area because the land alone is drained by it, and the cost of the main joint district sewer for the same reason may be taxed against the land which is drained by it. The lands in this proposed joint sewer district have never been taxed to pay the cost of a sewer that performs the function that this sewer is designed to perform, nor are the small joint district sewers that have already been paid for to be abandoned or superseded by the one in question, but they are to drain into it and will be thereby afforded an outlet, without which they would not accomplish the purpose for which they were designed. The duty of the city in respect of

its sewers is not performed until it has given them an outlet, and as long as they retain the character of either district or joint district sewers, as distinguished from public sewers, their cost may be taxed against the lands exclusively drained by them.

Section 10, article 9, of the city charter in reference to district sewers above quoted also declares that ''no such district shall be subdivided or changed after a district sewer shall have been constructed therein.'' And section 11 in reference to joint district sewers says they shall be constructed ''in like manner in all respects as is provided in section ten of this article in cases of district sewers.'' From this it is argued that a joint district sewer once constructed, there can be no change, and the land once taxed for a district and joint district sewer can not be taxed in any other district or joint district. Those provisions of the charter mean that land that has once been taxed to build a district or joint district sewer can not be taken out of such district or joint district and deprived of the use of the same, nor can it be placed in another similar district or joint district and subjected a second time to a like burden, nor can land which was not in the district or joint district when the sewers were built be added to the district or joint district and have a benefit for which it paid nothing. But they do not mean that land which has been taxed for the sewer system as far as the system has gone, may not be taxed for the extension of the system when extension, in the opinion of the lawmaking department of the city, is necessary.

In all that we have said up to this time we have assumed that this is a joint district sewer which the city is intending to build, and our conclusion is that if it is a joint district sewer the city is acting within its charter powers and the plaintiff has no cause to complain.

But the most earnest insistence on the part of appellant is that the proposed structure is in fact a public sewer and is misnamed in the ordinance a joint district

sewer, and that as a public sewer it should be paid for out of the city treasury and not in special taxbills.

If it is in fact a public sewer, the common council could not by merely giving it a name change the fact. And no more could the common council, if it is in fact a joint district sewer, make it a public sewer by calling it by that name. In Hill v. Swingley, 159 Mo. 45, a similar clause in the charter of the city of St. Louis was under discussion and it was therein said: "And the difference between a public and a district sewer is not a mere difference in name, but is a physical fact, so that the municipal assembly can not, by ordinance or otherwise, authorize the construction of what is in fact a public sewer and by merely denominating it a district sewer, tax the cost of its construction on the lots in a district named." At that time the charter of St. Louis called for only three classes of sewers, public, district and private, providing that public sewers were to be paid for out of the city treasury, district sewers by special tax on the land in the district, and private sewers by the individuals building them. There was then in that charter no definitions prescribed of the words public and district and they were left to their natural meanings. But since then the charter of that city has been amended as was pointed out in Prior v. Construction Co., 170 Mo. 439. The amendment adds a new class, to-wit, joint district sewers, to those before provided for and very clearly defines the meanings of the words "public," "district" and "joint district," as applied to sewers thereafter constructed in that city. So that what was said in the quotation from Hill v. Swingley, supra, would not apply to sewers in St. Louis constructed after the charter amendments discussed in Prior v. Construction Co., supra.

When lawmakers use a word they have a right to say, in the same act, what they mean by it, and in construing the act that definition is to be taken as the correct meaning as there used, although it may be a purely arbitrary definition. But of course, definitions in the charter of the city of St. Louis can not aid us in finding

out the meaning of a word in the charter of Kansas City. The terms "public," "district" and "joint district" applied to sewers are used in the charter of Kansas City without definition and are therefore to be construed in their natural or common meaning, there being no suggestion that there is any different known technical meaning.

The learned counsel for appellant in their brief say: "As the charter does not define what is a public sewer, the court must do so and determine whether this is such a sewer or not. It serves one-fourth in area of the entire city; its need is imperative for the public health; it is over a mile long and it is an extension at the lower end of a sewer already declared to be and established and built as a public sewer. The two together necessarily constitute one great public sewer." As counsel well say, the court must decide whether or not this is a public sewer.

What does the word "public," as applied to a sewer, mean? We know what is meant by the term "public road." Bouvier defines the word "public" to mean "The whole body politic or all the citizens of the State. The inhabitants of a particular place." The Century Dictionary gives it: "Open to all the people; shared in or to be shared or participated in or enjoyed by people at large; not limited or restricted to any particular class of the community." We can find no fault with those definitions, and bearing them in mind we have no difficulty in understanding what the framers of the Kansas City charter meant by the term "public sewers." It is a sewer open and available to the whole city and not limited to any particular part. In a sense a sewer that drains one-fourth of a large city is of benefit to the whole city. But that is true in the same sense of a small district sewer, or even of a private sewer. For if a small district, or even an inhabited private house becomes in an unsanitary condition its injurious influence is extended beyond its own limits.

If a sewer is available as a means of drainage to an area less than the whole city, especially if it is exclusively reserved for the drainage of an area less than the whole, even if it were physically possible to drain the whole into it, it is not a public sewer. And this is so regardless of its dimensions. We therefore hold that the contemplated sewer is a joint district, and not a public sewer.

It is argued, however, that the common council has in its ordinance, under which the part of the contemplated sewer that was built in 1893 with proceeds of the bonds above mentioned was built, denominated it a public sewer, as it so did in two other ordinances under which two other parts of it were subsequently built and paid for out of the general treasury of the city. But if the common council can not convert a public sewer into a joint district sewer by giving it a name, neither can it convert a joint district sewer into a public sewer by giving it a name. And if the common council under a misapprehension of the facts has appropriated money out of the city treasury to pay for work that was chargeable alone on property in a district, the owners of property in that district have no cause to complain.

It is further urged that the outlet of this proposed sewer is closed or impaired by filling in the river at that point by a company that has taken possession of it. We are not prepared to say that, if that outlet was at the foot of Santa Fe street, the company referred to had the right to take possession and make accretions at that point that would result in the impairment of the city's rights. But when the city gets to that point with its sewer, if it find its way impeded, it has ample power under its charter to open a way to the river. [Article 7, Charter Kansas City.]

The circuit court took the correct view of the law as applicable to the agreed facts of the case, and its judgment is therefore affirmed.

All concur.