A. B. SOUTHWORTH et al., Appellants, v. MAYOR, COUNCILMEN AND CITIZENS OF GLASGOW et al.

In Banc, December 31, 1910.

1. **NOTICE by PUBLICATION: Fifteen Days: One Publication Sufficient.** Where the statute required that "fifteen days' previous notice be given in a newspaper," a notice published fifteen days before the election at which the bonds were voted, and published only once, was sufficient. The law does not require a continuous publication. A single publication appearing fifteen days before the election is a compliance with the statute. If it said the notice must be given "once a week" or "daily" for fifteen days, that would be a very different statute.

2. ————: ————: **Personal Notice.** If the statutory notice was insufficient, a personal notice of the bond election sent to each voter would be of no avail; it would only tend to indicate absolute fairness.

3. **COUNTING VOTES: By Mayor and Council.** The fact that the mayor and council, after the judges and clerks of election had counted the ballots and certified the result and returned the ballots to the secretary of the council, strung on strings but not sealed up, recounted the ballots and corrected the count, their count making no change in the result, there being no fraud, and the statute and ordinance authorizing them to cast up the result, was at most a mistake as to their powers under the law, and in no way invalidated the result of the election or affected the legality of the bonds.

4. **CENSUS-TAKER: Appointed by Mayor.** Under Sec. 6300, R. S. 1899, authorizing the city to pass an ordinance causing a census to be taken, the city had a right in 1904 to enact an ordinance authorizing the mayor to appoint a census-taker, and

the ordinance was not invalid because.it did not itself name the census-taker, but conferred the power to appoint him upon the mayor.

5. **PUBLIC SEWER: Insufficiency of Bonds.** Where the ordinance provided for $4000 "to construct public sewers within the city limits," and the .evidence shows that no ordinance has been passed locating the sewers and that $4000 would not be enough to construct a public sewer which would be available to the entire city, it cannot be held that only a district or private sewer could be constructed from the proceeds and the bonds are therefore void—for two reasons: first, a sewer does not necessarily have to accommodate the whole city in order to be a public sewer; and, second, it will be time enough to make that complaint when the council by ordinance undertakes to use the fund to construct a sewer other than a public sewer.

6. **BOND ISSUE: Sufficient Assessed Valuation: Railroad and Telephone Properties.** It is not error to include the value of railroads and bridges and telegraph and telephone companies in the assessed valuation of the city property; and where the valuation of those things, added to that of the real and ordinary personal property, was $606,689, there was a sufficient valuation to authorize a bond issue of $30,000, whether the properties of merchants and manufacturers be included in the valuation or not, and hence it is not necessary to determine whether or not they should have been excluded from the valuation.

7. ————: ————: **Unplatted Lands.** Unless a showing is made of the value of unplatted lands within the city limits which it is claimed should not have been included as a part of the assessed valuation of the city property, the court will not determine whether or not they should have been excluded, because, without such showing, it could not determine how much the aggregate valuation should be reduced.

Appeal from Howard Circuit Court.—*Hon. A. H. Waller*, Judge.

AFFIRMED.

*J. H. Denny* and *E. W. Henry* for appellants.

(1)    Section 6276, R. S. 1899, provides that not less than fifteen days' previous notice shall be given by publication in some newspaper published in such city or town. There was only one publication of notice of

the election in this case, which was published in a weekly paper. One publication of such notice was not sufficient. Stine v. Wilkson, 10 Mo. 66. This decision has never been overruled or criticised. It is cited by the Supreme Court in Patterson v. Fagan, 38 Mo. 80, and in German Bank v. Stumpf, 73 Mo. 315. It is the general understanding and practice in the country, where the statute requires fifteen days' previous notice by publication of an election to issue municipal bonds, that the notice—if it be published in a weekly paper— shall be inserted not less than fifteen days before the election and be continued in every issue up to the time of the election. This is the construction of the statute in question, and other similar statutes, by this court. State ex rel. v. Allen, 178 Mo. 555; Drainage District v. Campbell, 154 Mo. 151. Where a statute is construed by a judicial opinion, published and generally known, and afterwards is re-enacted, the judicial construction is embodied in the re-enactment. Northcutt v. Eager, 132 Mo. 265; Handlin v. Morgan County, 57 Mo. 114; Sanders v. Anchor Line, 97 Mo. 26; State ex rel. v. Withrow, 133 Mo. 501; Camp v. Railroad, 94 Mo. App. 272; Sedalia v. Gold, 91 Mo. App. 32. When in 1897 the Legislature enacted Sec. 6276, R. S. 1899, directing how notice of election to issue municipal bonds shall be given, and incorporated therein the words "not less than fifteen days' previous notice shall be given by publication in some newspaper published in such city or town," it intended to express the meaning previously put upon them. It has been uniformly and consistently ruled that where judicial construction has put a certain meaning on the words of a statute and then the Legislature in a subsequent act *in pari materia* uses the same words, the presumption arises that the Legislature intended to express the meaning previously put upon them. State v. Hamey, 168 Mo. 167. The statute requiring a notice of special election to be given is mandatory, and if such requirement is not strictly

followed, the election is void. State ex rel. v. Smith, 129 Mo. App. 49. (2) Section 3 of article 8 of the Missouri Constitution prohibits a recount of the ballots except in cases of contested elections, and section 9 of the same article provides that such contests shall be in courts of law. Constitution, art. 8, secs. 3 and 9; State ex rel. v. Francis, 88 Mo. 557; State ex rel. v. Board of Schools, 112 Mo. 213. The judges and clerks of election, and the canvassers, were designed to act independently of each other, and the latter were not intrusted with the power of revising and correcting the mistakes of the former. In every election a tribunal has been selected to revise the actions of all the officers concerned and to correct any mistakes or injustice which have been committed, and the canvassers do not constitute that tribunal. Mayo v. Freeland, 10 Mo. 629; Windes v. Nelson, 159 Mo. 76. In this case the mayor and city councilmen, after the votes had been counted, where there was no contest, and where no voter or citizen could be heard, opened the ballots and recounted them, and certified and cast up the result of the election on the count made by them. The mayor and councilmen were under no oath as were the judges and clerks of election, and in their unauthorized action were not amenable to any law, civil or criminal. The admission of ballots in evidence depends upon the primary proof that they have remained in the same condition in which they were cast; that they have remained in the custody of the officer charged with their keeping and that no opportunity has been afforded whereby they might have been changed or tampered with. Windes v. Nelson, 159 Mo. 68; McCrary on Election (2 Ed.), sec. 277; Ex parte Arnold, 128 Mo. 288; Coglan v. Beard, 67 Cal. 303; Ex parte Brown, 97 Cal. 83. (3) As to the proposed $4000 sewer bonds, it is apparent from the testimony that the proposed sewers will be either private or district sewers and not public sewers. No action had been taken or ordinance

enacted to locate the proposed sewers. The mayor says they were meant for sanitary sewers to carry off slops, toilets, baths and such as that. That it would not be possible on $4000 to construct public sewers available to the entire city, but that it was to be left to the city council as to where the sewers would be placed. A public sewer is one that is open and available to the whole city, and not limited to any particular part of it. South Highland Co. v. Kansas City, 172 Mo. 523; Laws 1909, p. 329.

*Percival Birch* and *W. M. Williams* for respondents.

(1) (a) The notice given of the special election fully complied with the statutory requirement. "Fifteen days' previous notice by publication" in a weekly newspaper published in said city was given. "The statute does not direct that the notice shall be published any specified number of times." It merely requires that fifteen days' previous notice shall be given of the election by publication in some newspaper published in such city. R. S. 1909, sec. 9595; Bank v. Stumpfe, 73 Mo. 314; State ex rel. v. Allen, 178 Mo. 574; State ex rel. v. Wilder, 200 Mo. 103; In re Wooldridge, 30 Mo. App. 619; Railroad v. Shipley, 19 Atl. (Md.) 2; Bank v. Mayor, 18 Atl. (Md.) 809; McGilvery v. Lewiston, 90 Pac. 348; Aldis v. Comrs., 49 N. E. 565; Smith v. Atlanta, 51 S. E. (Ga.) 741; Montford v. Allen, 36 S. E. (Ga.) 305; Royal Ins. Co. v. Comrs., 51 N. E. (Ill.) 558; Stone v. Chicago, 69 N. E. (Ill.) 974; In the Matter of Basford, 50 N. Y. 509; Erickson v. Cass County, 92 N. W. 841; Cleveland v. Calvert, 31 S. E. (S. C.) 871; 2 Paige and Jones on Taxation by Assessment, sec. 763. (b) Certainly no complaint can be made that the voters were misled for want of actual notice or that sufficient publicity in fact was not given. The testimony shows that, in addition to the frequent

reference to the election by the press of the city, the mayor mailed notices of the election and circulars in regard to the city's affairs and the reasons for the issue of the bonds to each qualified voter. While this may not supply the notice required by the statute, it eliminates any possible ground of complaint because of a want of actual notice. (2) The election having been properly conducted by the judges and clerks appointed for that purpose and the ballots having been counted and the result duly certified by them at the close of the polls, the recount of the ballots by the mayor and board of councilmen, with the same result as that reached by the judges, will not invalidate the election or defeat the expressed will of the voters. Windes v. Nelson, 159 Mo. 51; 15 Cyc. 382; Atkinson v. Loben, 111 Cal. 419. The mayor and board of councilmen were empowered by the statute to prescribe regulations for conducting the election and the Australian ballot law is inapplicable. R. S. 1909, secs. 5921 and 9595. (3) The property of railroad, bridge, telegraph and telephone companies in the city of Glasgow was properly included in the value of the taxable property of said city in ascertaining the extent of its debt-creating power under the Constitution. R. S. 1909, sec. 11553; State ex rel. v. Railroad, 116 Mo. 24; Thornburg v. School District, 175 Mo. 28. Merchants' and manufacturers' stock and property is now assessed and the valuation equalized as other property and was properly included in the estimate. R. S. 1909, sec. 11623. There is no authority under the Constitution for excluding from the aggregate value of the property of the city in determining this question land not divided into lots, even though such lands should not be subject to city taxes. Sec. 12, art. 10, Constitution of 1875; Thornburg v. School District, 175 Mo. 28; Darlington v. Trust Co., 16 C. C. A. 35. No evidence was introduced and there is nothing in the record to show the value of any such real estate, and no

232 Sup—8

basis is furnished upon which a deduction on that account can be made from the taxable value of the property in the city as "ascertained by the assessment next before the last assessment for State and county purposes previous to the incurring of such indebtedness," which is the rule prescribed by the Constitution for determining the debt-creating power of the city.

GRAVES, J.—Plaintiffs are resident taxpaying citizens of the city of Glasgow, Missouri, a city yet existing under an old special charter granted by the Legislature, and subsequently amended by subsequent acts of the same body. Defendants are the mayor and secretary of said city, the city of Glasgow in its corporate capacity, and the State Auditor.

The purpose of the suit is to restrain by writ of injunction the issuance and registration of $30,000 of municipal bonds for three separate municipal purposes alleged to have been voted by the voters of said city at a special election held on October 18, 1909. The petition assails the legality of these proposed bonds upon some six grounds, but as these are made the basis of the several assignments of error in this court they need not be stated here, but will be discussed in the opinion. The petition sets out the ordinance and pleads many facts which are admitted in the answer.

The answer, after some formal admissions as to the official character of the defendants and the corporate capacity of the said city, proceeds as follows:

"These defendants further admit the passage of the ordinance set out in said petition, and the holding of the election therein referred to, and that the propositions set out in said ordinances were carried by a majority of more than two-thirds of the qualified voters of said city of Glasgow, voting at the election referred to in said petition, and that these defendants intended and are about to carry out and execute the directions of the voters as expressed at said election and to issue

bonds of said city for the purpose and in the amount authorized by said qualified voters at said election, and that the said defendant Gordon as Auditor of the State of Missouri is about to register the same as required by law.

"Defendants for further answer deny each and every allegation in said petition contained, and having fully answered, ask to be hence dismissed with their costs."

Upon trial the circuit court entered its judgment dismissing the plaintiffs' bill and for costs against plaintiffs.

After proper steps plaintiffs have perfected an appeal to this court from such judgment. The pertinent facts can best be stated in connection with the points made in the course of the opinion.

I.   The first point made in the brief of plaintiffs is that the election was void because fifteen days' previous notice was not given according to law. By proof it appears that the notice of the election was published in the *Glasgow Missourian,* a newspaper of that city, on September 30, 1909, but was only published the one time. By proof it further appears that the mayor notified each voter by letter. It was not a personal letter, but he mailed to each voter literature showing why the ordinance should be adopted and the date of the election was called to the attention of the voter. The question was likewise discussed in the public press of the city.

Section 6276, Revised Statutes 1899 (now Sec. 9595, R. S. 1909), in speaking of the notice to be given of an election to take the sense of the voters upon the question of increasing the municipal debt, says:

"Of which (meaning the election) not less than fifteen days' previous notice shall be given by publication in some newspaper published in such city or town." Plaintiffs claim that this language means that such notice must be published in each issue of the paper

from the date of the first publication to the date of the election. Defendants of course contend *contra*.

Plaintiffs rely upon the wording of the statute, supra, and the old case of Stine v. Wilkson, 10 Mo. 75. There is language in this case which supports the contention of counsel for plaintiffs, yet intermingled with it is other language that is not so plain, thus: "The deed of trust does not specify particularly the number of times when the notice shall be published, but enough can be collected from that instrument which, when taken in connection with the acts of Stine, the defendant, show what must have been the intention of the parties." Why the court used this expression we do not know, because the short excerpt from the deed of trust found in the opinion is in this language: ". . . proceed to sell said land and premises at public auction for cash to the highest bidder, at the courthouse door in St. Louis, first having given twenty days' previous notice of the time and place and terms of sale, and property to be sold, by advertisement in some newspaper printed in the city of St. Louis." But notwithstanding the uncertain language used by the court, suffice it to say that there was one publication twenty days before the sale, and the court held such notice bad.

The Stine case is cited with approval in Washington v. Bassett, 15 R. I. 563. That court in discussing the question said: "The complainant brings this bill to redeem, claiming that there has been no valid sale under the power claimed in the mortgage, because the requirement of the power, 'first giving twenty days' notice of such sale in some one of the public newspapers printed in said city of Providence,' has not been complied with. The mortgage sale took place August 12, 1885. The notice was published in *The Evening Mail*, a daily newspaper printed in Providence, seven times, viz., July 22d, 25th, 29th, August 1st, 5th, 8th, and 11th. The question is, whether such publication of the

notice satisfies the requirement of the power. We do not think it does. The evident purpose of the requirement is to secure ample notice of the sale, for the mutual advantage of the mortgagor and mortgagee. The mortgagee is allowed to select the newspaper in which he will give the notice; but the extent of the notice is definitely expressed. It must be 'twenty days' notice.' We think the fair and natural interpretation of that phrase is, that the notice is to be continuous, in the paper selected, for twenty days. The defendants contend that, inasmuch as the notice covered a period of twenty days, it was 'twenty days' notice.' But if seven insertions in a daily paper, covering the time, is to be held equivalent to twenty days' notice, why would not two, say on the first and last days of a period of twenty days, or even one twenty days before the sale? If anything less than a continuous notice is sufficient, we do not see why one or the other of these would not also be sufficient."

This is the strongest and practically the only case which we have found directly upholding the Stine case. We agree with the Rhode Island court, that if anything less than the continuous notice is meant by the words of the deed of trust in that case, and the words of our statute in this case, then one publication is sufficient. We think, however, that the weight of authority, so far as the construction given to these words "fifteen days' notice" or "twenty days' notice" is against the holding of the Stine case, as well as that decided by the Rhode Island court. Much language used in our own later cases would so indicate, although in precise terms the exact point is not made by reason of the facts of the several cases.

Thus in German Bank v. Stumpf, 73 Mo. l. c. 315, it is said: "When thirty days' notice is required, thirty days should, of course, intervene between the first publication and the day of sale, and although it may be customary and prudent to continue the notice in every

issue of the paper from its first insertion to the day of sale, yet it has been expressly decided that 'thirty days' notice in a daily paper' does not mean thirty days' daily notice in such paper. [White v. Malcolm, 15 Mo. 543. *Vide* also Johnson v. Dorsey, 7 Gill 286; Leffler v. Armstrong, 4 Iowa 482.] We think, however, that where the notice has not appeared in every issue of the paper from its first insertion to the day of sale, and the omission to make continuous publication thereof is of such a character, or is attended by such circumstances as to mislead the public and work injury to the party whose property is sold, the sale may be set aside. [Stine v. Wilkson, 10 Mo. 96.] To avoid such a contingency, therefore, in all cases where notice is required to be published in a daily paper, the notice should be published in every issue of such paper from the first insertion up to and including the day of sale." Summarizing this opinion it holds in effect that one publication thirty days prior to the sale meets the requirements of the deed of trust, but that if the omission to further publish is attended by such circumstances as to mislead the public and work injury to the party whose property is sold, the sale *may* be set aside, not *must* be set aside. Had Judge Hough, who then spoke for the court, thought thirty days' continuous notice was required he would not have spoken as he did.

Again, in State ex rel. v. Allen, 178 Mo. 1. c. 574, we said: "It is said that the writ should be dismissed, because fifteen days' notice of said special election was not given in a newspaper published in said town, or in any other way. The resolution required that fifteen days' previous notice should be given of the election, by publication in the *Canton News,* a weekly newspaper published in the town of Canton. It appears from the record that the notice of the election was published in the *Canton News,* a weekly newspaper published in said town, the first insertion being made on September 4, 1902, the second on the 11th, and the third on the 18th

of said month, while the election was held on the 23d
day of the same month; nineteen days having elapsed
from the time of the first insertion and the election.  It
was held in the case of German Bank v. Stumpf, 73 Mo.
311, that where a deed of trust required that thirty
days' notice of sale be given by publication in a daily
newspaper, thirty days must intervene between the first
publication and the day of sale, but while it was cus-
tomary and prudent, it is not essential that the notice
appear in every issue of the paper.  The same rule is
announced in In re Wooldridge, 30 Mo. App. 612;
Nishnabotna District v. Campbell, 154 Mo. 151, and
Kellog v. Carrico, 47 Mo. 157.  It therefore seems that
the notice was published in conformity with the reso-
lution.''

In State ex rel. v. Wilder, 200 Mo. l. c. 103, this
court said: ''It is conceded that the notice of election
provided for by said ordinance was published in the
*Chillicothe Constitution,* a daily newspaper, for sev-
enteen consecutive issues of said paper, beginning with
the issue dated the 6th of January, 1906, and contin-
uing from day to day until and including the 25th day
of January, 1906, and that the election was held on
the 29th day of January, 1906.  Counsel for the re-
spondent, the State Auditor, makes the point that this
publication was insufficient because it did not continue
up to and including the day of election.  Upon the au-
thority of German Bank v. Stumpf, 73 Mo. 311, and
State ex rel. v. Allen, 178 Mo. 555, we hold that the
notice was published fifteen days before the said elec-
tion, and that the failure to publish it on the three days
before the election did not render it bad.''

It thus appears that the doctrine of the Stumpf
case, supra, has since been approved, and that doctrine
is that continuous publication is not required.

When we go to other States the authority is over-
whelming as to the meaning of such words as we find in
our statute.  In Maryland the statute required ''sixty

days' notice." The Court of Appeals of that State, in Central Savings Bank of Baltimore v. Mayor and City Council, 71 Md. 518, said: "The power to pass the ordinance depends on the performance of this condition. In this case the first publication of the notice was more than sixty days before the passage of the ordinance. The statute does not direct that the notice shall be published any specified number of times; it merely requires that it shall be given. A notice may be given once, twice or a dozen times, and it may be repeated at distant intervals, but it is difficult to infer that it must be repeated, from the mere requirement that it shall be given. The statute prescribes a limitation under which the legislative power of the mayor and city council is to be exercised. If it were possible for us to change the terms of this limitation, we should be met with a very serious difficulty when we attempted to define the extent to which we should carry the change. Should we say that the notice was to be published ten, twenty or thirty times? Or should we say that the number of publications should be determined by the judgment which we might form of the exigencies of each particular case? The statute by its terms requires only one publication as a condition precedent to the valid passage of an ordinance of the kind under consideration. If this limitation be considered insufficient, it is in the power of the Legislature to make it more stringent; but courts ought to be extremely cautious of every construction which would virtually insert in a statute words which it does not contain."

The same court in the later case of Philadelphia, W. & B. R. Co. v. Shipley, 72 Md. 1. c. 94, after reviewing all of their previous cases construing such words, adds: "But, as we have said, the statute requires only one publication of this notice in each of the two papers, and, having complied with the law in that respect, it was entirely within the discretion of the examiner whether any additional publications should be made, or

any further expense incurred thereby." In this case there were two separate notices to be given under language such as ours. The first requirement was a "ten days' notice" and the second a "fifteen days' notice." There was a third notice, but it dealt with "successive weeks." It was of the first two that the court was speaking.

The Idaho court thus passes upon the meaning of "twenty days' notice" in the very recent case of McGilvery v. Lewiston, 13 Id. 354: "Appellant complains because this notice was not published in every issue of the paper for twenty days. There is no merit in this contention. The statute does not undertake to specify the number of issues of the paper in which the notice shall appear. The requirements of this statute will be fully met if the notice is published once, and the date of publication is at least twenty days prior to the date of the meeting or other action of which the publication purports to give notice. [Royal Ins. Co. v. Commissioners, 175 Ill. 491; Aldis v. Commissioners, 171 Ill. 424; P., W. & B. R. Co. v. Shipley, 72 Md. 88.]" That court followed the Shipley case, supra, and some Illinois cases and cites them in the opinion.

The Supreme Court of Georgia had for consideration the meaning of the words "after advertising for thirty days" in the case of Montford v. Allen, 111 Ga. l. c. 20. Cobb, J., after a full consideration of the subject, uses this language: "Treating it as settled that the Legislature did not intend by this provision in the charter of Americus that a tax sale should be advertised every day for thirty days, what was its intention with reference to the number of times a notice should be inserted within that period? There can be but one answer to this question and that is that an advertisement appearing at one time at least thirty days before the day of sale, and as nearly as practicable immediately preceding the beginning of that period, would be an advertising within the meaning of the

charter. That would be giving thirty days' public notice of the sale, or announcing publicly that the sale was to take place at the expiration of that time; and if the charter is to be construed as requiring advertisement in a newspaper, but one insertion of the advertisement at least thirty days before the sale, and as nearly as may be immediately preceding the beginning of that period, would be a compliance with the law.''

In New York a statute provided for two days' notice and it was held that one publication fulfilled the requirements of the statute. [50 N. Y. 509]

The Supreme Court of South Carolina had under consideration the phrase ''three weeks' notice'' in the case of Cleveland v. Calvert, 31 S. E. 1. c. 872, and through JONES, J., said: ''The statute in question does not require a publication 'once a week' nor does it require advertisement for three weeks. Since it merely requires notice to be advertised at least three weeks before the election, a single publication appearing three weeks previous is a compliance. To hold otherwise would be to interpolate words which the Legislature did not see fit to employ, and which, in reference to other matters, it is accustomed to employ when the intention is to require publication at least once a week.''

What is said here is applicable to our Missouri statute, for we have statutes which do direct the number of publications and as to when the last publication shall be made with reference to the date the act is to be done.

The Illinois Supreme Court in Royal Ins. Co. v. Commissioners, 175 Ill. 491, in construing the term ''ten days' notice,'' said: ''The next objection made by the plaintiffs in error is that the court below is without jurisdiction to enter judgment of confirmation, upon the alleged ground that the notice of application for the confirmation was insufficient. Such insufficiency is alleged to consist in the fact that only one

day's notice was given and that a ten days' continuous notice should have been given. In Aldis v. Commissioners, supra, this objection was considered, and it was there held that a single publication ten days before the application, was sufficient, and that the Park Act did not require such notice to be published for ten successive days." Several other Illinois cases, as indicated above, are to the same effect.

Other authorities in point might be collected and quoted from, but these sufficiently show the trend of judicial opinion as to the construction of the words we are called upon to construe. With the trend of our own court and with the almost unbroken line of cases from other States we feel constrained to rule that the publication of the notice of election in the case at bar was sufficient, and we so hold.

Of course, the personal notice sent out by the mayor to the voters would be of no avail; if the statutory notice was insufficient the election would fail. Such personal notices would only tend to indicate absolute fairness in the election.

II.   From the evidence it appears that the judges and clerks of the election counted the votes and made return thereof under proper certificates, and that thereafter the mayor and city council recounted the votes, finding some slight discrepancy, but not sufficient to change the result. The three propositions were separately stated on one ballot, so that the voter had to scratch either "yes" or "no" after each of the three propositions being submitted to the voters. All propositions carried by much more than a two-thirds majority.

Plaintiffs' second contention is couched in as short terms as we can use, and we borrow their language. It reads: "The action of the mayor and councilmen in opening and recounting the ballots, after the same had been counted by the judges and clerks of the election,

and entering the result of the recount as the official re-
sult of the election, was forbidden by section 3 of
article 8 of the Missouri Constitution and made the
election void.''

The ballots were returned to the council by the
election officers. They were strung upon a string and
not sealed in boxes as required by the general law.
No complaint is made as to any of the proceedings
save and except the action of the mayor and council in
recounting the ballots. What was in fact done is thus
described by one of the witnesses, the mayor:

"Q. What was done with reference to counting
the ballots of the special election held on the 18th of
October, 1909, with reference to counting the ballots?
A. The judges and clerks first counted the ballots and
made a return on the poll books, and the council then
met and cast up the ballots and made an official record.

"Q. What do you mean? A. They recounted the
ballots.

"Q. They opened the ballots? A. They did, they
were on a string, you know.

"Q. And the result of this election was officially
declared according to the count made by the city coun-
cil—is that correct? A. Yes, sir."

The witness further said:

"Q. When the returns were made—did they cer-
tify to the returns, the clerks and judges? A. Yes, sir.

"Q. How did the count made by the council com-
pare to the count made by the clerks and the judges?
A. Just a few votes difference.

"Q. It did not change the result at all? A. No,
sir."

It is the facts disclosed by this evidence that plain-
tiffs urge invalidate the election.

Section 8 of the ordinance concerning the election
provided for the appointment of judges and clerks, and
provided that they should take an oath to impartially
discharge their duties and not to disclose how any

voter may have voted unless compelled so to do as a witness in a proper judicial proceeding.

Section 9 required the clerks to keep a record in well bound books of the name of each voter and number of his ballot set opposite the name.

Section 10 thus reads: "It shall be the duty of the several judges and clerks of election to count the votes cast, and to keep a record thereof, and to cast up the results of such election, and to verify the same, and to publicly announce the results of the election as soon as the same is known to them, and they shall deliver to the city secretary the ballots, tally sheets and poll books properly certified. Afterwards, on the 18th day of October, 1909, the mayor and board of councilmen shall meet for the purpose of casting up the said ballots and shall declare the results of the election, on the several propositions aforesaid, by ordinance."

The Australian ballot law does not apply to the election with which we are now dealing. [2 R. S. 1909, sec. 5921.]

We have outlined this ordinance and quoted one section thereof for the reason that to our minds it explains the conduct of the mayor and city council. The statute, 3 Revised Statutes 1909, section 9595, provides: "Such election shall be held and judges and clerks thereof appointed as in case of other elections in such city or town, *or in such manner and under such regulations as may be prescribed by ordinance.*"

It appears that this city council adopted the latter course. It passed an ordinance for the regulation of this election. The ordinance quoted speaks of the mayor and council "casting up the said ballots," and it was no doubt from this clause that they got the idea of recounting the ballots upon these strings. We do not desire to discuss the propriety of this language in the ordinance, but mention it as tending to show that there was no malicious wrong committed by this canvassing board. They evidently understood that they

had the right to recount the ballots and in so doing acted in good faith and with no fraudulent intent. The waterworks proposition was carried by a vote of 236 to 71; the sewer proposition by a vote of 222 to 84; the light-plant proposition by a vote of 224 to 79. The evidence shows that there was but a few votes difference in the two counts. The propositions carried, as will be seen, by a big vote for a city having little more than 2000 inhabitants. Absolute fairness seems to have characterized the acts of the city officials, both in notifying the respective voters and in casting up the votes. If the canvassing board made a mistake under the law and their ordinance in recounting this vote the will of the people should not be thwarted thereby. At most it was but an erroneous judgment upon their part. No fraud is charged or could be charged. If the will of the voters could be thwarted by such an act, designing canvassing boards could always so do. Much is said in the briefs about the secrecy of the ballot. Many cases are cited, discussed and quoted from, but all this is beside the question in the case at bar. The ballots were not sealed, but they did not have to be sealed under the ordinance. The canvassing board did not compare the ballots with the poll lists, and the secrecy of no ballot was exposed, so far as this evidence shows, and we have quoted it in full. There is nothing in the point and it is ruled against the plaintiffs.

III. To show the population of the city of Glasgow the defendants offered a special census taken by said city in 1904. To this evidence the plaintiffs objected. They now urge that the census was not taken in accordance with law, because the ordinance providing for the taking of the census did not name the census-taker, but authorized the mayor to name and appoint such person.

The law governing the taking of a census in 1904 was Revised Statutes 1899, section 6300. It is now Re-

vised Statutes 1909, section 9639. There was an act in 1905 (Laws 1905, p. 80) relating to cities of the fourth class. But this is immaterial in this case, and we only mention it now because counsel cite us to State ex rel. v. Wilder, 211 Mo. 305, where we discuss that act. It is sufficient to say that this census was under section 6300, Revised Statutes 1899, and could not be affected by this Act of 1905, because taken before that time. Further the Act of 1905 applies to cities of the fourth class solely.

The law does not undertake to say that the council shall designate by ordinance the census-taker. The law authorizes the city to pass an ordinance causing a census to be taken. Under the law the council could pass an ordinance authorizing the census to be taken and also empowering the mayor to select and appoint the census-taker or census-takers. The ordinance in this case authorized the appointment of a census-taker by the mayor. Singular to say, plaintiff, A. B. Southworth, was the mayor of the city at the time, and appointed E. W. Henry, his present attorney, as the census-taker. The mayor's authority to appoint does not seem to have been questioned at that time. Of course we do not say they are estopped from questioning it, but it only demonstrates how rapidly a person's views of the law may change.

Mayor Southworth was right in appointing the census-taker in 1904, and is wrong in his contention urged here.

IV. The ordinance provided for $4000 "to construct public sewers within the city limits." The objection is that no ordinance had been passed or action taken toward locating these sewers. There is testimony tending to show that $4000 would not construct a public sewer which would be available to the entire city. From this it is argued that such a sewer as could be constructed would be a district or private sewer.

There are two answers to this contention. In the first place, counsel are wrong in what is a public sewer. A sewer does not necessarily have to accommodate the whole city to be a public sewer. Counsel cite us to the case of South Highland Land and Imp. Co. v. Kansas City, 172 Mo. 523, for a definition of a public sewer, and some of the language of that case bears out the contention. This question was again threshed out in Court in Banc in the very recent case of State ex rel. v. Wilder, 217 Mo. l. c. 271. The meaning of the term "public sewer" is discussed in the separate opinion of WOODSON, J., in the case supra, and to his opinion a majority of the court agreed. Counsel therefore are in error as to what constitutes a public sewer.

Secondly, it will be time enough for plaintiffs to complain when the council by ordinance undertakes to use the funds for a sewer other than a public sewer.

This contention is ruled against the plaintiffs.

V. Another contention is that there was error in the including in the abtsract of the assessed property within the city of Glasgow, the assessed valuation of the merchants and manufacturers, and of the railroads, bridges, telegraph and telephone companies.

That railroad property is taxable for such purpose is clearly shown by the statute. [3 R. S. 1909, sec. 11,553.] This section says that such property "shall be subject to taxation for State, county or other municipal or local purposes." What would apply to railroads, would and should apply to bridge, telegraph and telephone companies.

In this case the evidence shows that, excluding the merchants' and manufacturers' assessments, which was $40,500, and the railroad, bridge, telegraph and telephone companies' assessment, which was $20,429, there was left an assessment of personal and real property of $586,260. Add to this last sum the assessment of the railroad, bridge, telegraph and telephone

companies, and we have a total of $606,689, which is more than sufficient to carry the proposed bond issue.

Under these circumstances it becomes unnecessary to discuss the question as to the merchants' assessment.

VI. Last it is contended that there was error in including in the real estate assessment some unplatted ground within the city limits, which plaintiffs claim should not have been included. It is not necessary to go into the legal question as to whether or not such land was exempted from the city taxes, for the reason that plaintiffs have made no proof as to what were the assessed values of these lands, so that we could deduct the same, if under the law they should have been deducted, in determining what was the assessed value of the property within the city. Had plaintiffs been serious in this matter, and desired the court to pass upon the law, they should have shown the assessed value of these alleged exempt lands. Without such showing, we would have no way of determining the question as to what was the real assessed value of the taxable property.

Upon the whole this cause has been well tried and the judgment of the circuit court is affirmed. All concur, except *Burgess, C. J.,* absent.